(276 P.3d 804)
No. 105,169

STATE OF KANSAS, *Appellee*, v. ANTONIO M. JONES, *Appellant*.
Rev'd and remanded by S. Ct. order May 6, 2014.

Opinion filed May 4, 2012.

*Patrick H. Dunn*, of Kansas Appellate Defender Office, for appellant.

*Julie A. Koon*, assistant district attorney, *Nola Tedesco Foulston*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before STANDRIDGE, P.J., MCANANY and ATCHESON, JJ.

MCANANY, J.: This appeal arises out of Antonio Jones' conviction of dealing in pirated recordings of recently released movies. The events leading to his conviction began when Sergeant Colin Gallagher of the Wichita Police Department received a tip that Tonya Edwards was illegally distributing pirated DVDs at her place of employment. When Gallagher interviewed Edwards, she denied

selling any DVDs but informed Gallagher that she had purchased pirated DVDs from her coworker, Serena Stone. Edwards stated that Stone told her that her boyfriend, Antonio Jones, made the DVDs. Edwards told Gallagher that two other coworkers, Kathleen Badders and her daughter Ashley Badders, also bought DVDs from Stone.

Gallagher questioned Stone along with Kathleen and Ashley Badders. Ashley and Kathleen told Gallagher that they had also purchased DVDs from Stone. Stone said that the DVDs were given to her by Jones, who created them by downloading movies off of the Internet. Stone said she gave the money from the DVD sales to Jones and did not keep any of the money herself.

Both Jones and Stone were charged with dealing in pirated recordings. Stone entered into a diversion agreement with the State in advance of Jones' trial.

At trial, Edwards and the Badders testified that they bought several pirated DVDs from Stone over a 3-week period. None of them had any contact with Jones, but they understood from Stone that the DVDs came from Stone's "baby's daddy," who was Jones. The DVDs were delivered to them within a day after they ordered them from Stone. Ashley testified that the quality of the DVDs was "horrible." She told Sergeant Gallagher that one of the DVDs appeared to have been taken in a movie theater and another one had subtitles in some Asian language.

Gary Kissinger, a regional director of investigations for the Motion Picture Association of America (MPAA), testified that about 90 percent of the world's pirated movies are obtained by the illicit recording of movies using a handheld camcorder while the movie is being played in a movie theater. DVDs sold by Stone of the movies *Mall Cop, Hotel for Dogs, Notorious, Taken, Marley & Me,* and *Bride Wars* were introduced into evidence at trial as examples of camcorder movies Stone obtained from Jones.

Camcorder recordings in movie theaters are then uploaded onto an Internet site and ultimately downloaded onto a computer from which the movie is recorded onto a DVD for distribution. Here, the lead-in on the DVD of the movie *Mall Cop* consisted of a menu that is not found on any movie studio-distributed DVD. The DVD

of *Hotel for Dogs* contained the same nonstandard menu. The DVD of *Notorious* contained a personal menu someone added. The pirated version of the movie *Taken* contained Japanese or Korean subtitles. Further, the framing of the picture in each movie was cropped so that some of the titles and lettering had been cut out of the picture. The DVD of *Bride Wars* contained the same cropping. The back of someone's head in the theater appeared in the camcorder recording of *Hotel for Dogs*. The back of a theater chair appeared in the camcorder recording of *Marley & Me*.

The other 10 percent of pirated movies, such as the DVDs of the movies *Grand Torino* and *The Curious Case of Benjamin Button* introduced into evidence at trial, were copies of DVDs distributed by movie studios to members of the Motion Picture Academy for viewing in advance of voting for the Academy Awards. The DVD of the movie *The Curious Case of Benjamin Button* contained the notice that it is a screener copy to be used only for Academy Awards consideration. The notice stated that the disc is the property of Paramount Pictures and Universal Entertainment. These DVDs, which are of higher quality and resolution than the DVDs of camcorder recorded movies, included an advisory that the disc is intended for the Academy member only and may not be duplicated, distributed, or sold in any format. The disc also contained an FBI anti-piracy warning advising that its content is copyrighted and any violation of the copyright subjects the violator to certain penalties.

Kissinger testified that a DVD can be determined to be pirated merely by examining the disc itself. Properly issued DVDs are manufactured at a factory where they are stamped from a mold onto a silver disc. Pirated DVDs are individually "burned" on a computer and have a purplish or rainbow color rather than silver.

According to Kissinger, movie studios usually do not release the DVD of a movie until 3 or 4 months after the movie has been exhibited in theaters. The DVDs at issue in this case were sold to Edwards and the Badders between January 5 and January 26, 2009. The movies contained in the pirated recordings had the following dates for their theatrical release:

| | |
|---|---|
| *Seven Pounds* | December 19, 2008 |
| *The Curious Case of Benjamin Button* | December 25, 2008 |
| *Marley & Me* | December 25, 2008 |
| *Grand Torino* | January 9, 2009 |
| *Notorious* | January 16, 2009 |
| *Mall Cop* | January 16, 2009 |
| *Hotel for Dogs* | January 16, 2009 |
| *Bride Wars* | January 19, 2009 |
| *Taken* | January 30, 2009 |

A pirated DVD of the movie *100 Feet* also was introduced into evidence. All of the movies at issue in this case were legitimately available only in theaters during the period in which the DVDs were purchased from Stone. Kissinger testified that none of the studios that produced these movies gave Jones or anyone else permission to copy them. According to Kissinger, all the discs introduced into evidence at trial were pirated.

Sergeant Gallager testified regarding the statements Stone and the other women gave to him in the course of his investigation. He testified that Stone did not identify any source for the DVDs other than Jones.

Stone testified that Jones was the father of her 9-year-old daughter. Stone regularly saw Jones several times a week for parenting visits. She last saw Jones the day before she testified at trial. She testified that she had a great relationship with Jones, who was a "great father" and provided both financial and emotional support.

Stone admitted that she requested and got the pirated DVDs from Jones. She told Jones she wanted the DVDs in order to sell them to her coworkers, but in later testimony she claimed Jones did not know of this in advance of the sales, though she was ordering multiple copies of the same movies from Jones. She testified that she offered to give Jones the money from the sales but "[h]e was like, no. You keep it." She admitted that she initially told Sergeant Gallagher that she gave the money to Jones but claimed she did so because she was afraid of going to jail.

The jury convicted Jones as charged, and Jones was placed on probation. At the time of sentencing the State submitted a letter

from the MPAA requesting restitution of $1,057.41, the wholesale value of the DVDs, and $913.11 in investigative costs. Because the investigative costs were not itemized, the district court left the issue of restitution open for 30 days to allow the parties either to agree on a restitution amount or to schedule another hearing. The parties reached an agreement on the wholesale value of the DVDs but not on the amount of the investigative costs. Two months later, the district court entered its final restitution order of $1,057.41. Jones appeals.

*Closing Argument*

Jones first argues that the district court violated his constitutional right to present a full and complete defense by not permitting him to argue in closing that he was not aware of the law and therefore did not know that the DVDs were produced in violation of law.

We have unlimited review over Jones' claim that the district court improperly limited his constitutional right to present a defense. *State v. Carter*, 284 Kan. 312, 318-19, 160 P.3d 457 (2007).

The State argues that Jones should be precluded from raising this constitutional issue for the first time on appeal. See *State v. Gomez*, 290 Kan. 858, 862, 235 P.3d 1203 (2010) (constitutional grounds for reversal asserted for the first time on appeal are not properly before the appellate court for review); *State v. Warledo*, 286 Kan. 927, 938, 190 P.3d 937 (2008) (issues not raised before the district court cannot be raised on appeal).

The issue arose during the discussion of Instructions Nos. 2 and 3 at the instructions conference. We take from the exchange that it is Jones' position that he was aware of the federal prohibition against the unauthorized distribution of copyrighted movies, but he was not aware of any Kansas prohibition and wanted to argue the distinction in closing. The prosecutor countered:

"I don't think it would be appropriate for defense counsel to argue in closing . . . that . . . it is against federal law, but he had no way of knowing that it was against state law. That would be a misstatement of the law, and I think that would be . . . outside of the wide latitude that is given the closing."

The district court agreed that Jones was presumed to know state law. The district court did not set a specific limitation on what defense counsel was allowed to argue in closing, simply noting:

"Whether he had read—[defendant] had read [K.S.A.] 21-3748, whether he had memorized it, whether he had committed it to memory, or whether he had never heard of it before is irrelevant. The law existed. People are presumed to know the law. And it doesn't fit in one of the exceptions for ignorance of the law can be a defense."

It is true that Jones' counsel's long, rambling, and confusing colloquy with the court at the instruction conference does not clearly stake out his objection. But while this is a close call, we conclude that Jones has preserved the issue for our review.

Moving to the merits of Jones' argument on this issue, a district court ruling which limits the scope of oral argument generally lies within the court's sound discretion. *State v. Francis*, 282 Kan. 120, 143, 145 P.3d 48 (2006); see *State v. Kuone*, 243 Kan. 218, 234, 757 P.2d 289 (1988) (district court did not abuse its discretion by placing limitations on statements made by defense counsel during closing arguments).

Jones was charged with violating K.S.A. 21-3749(a), which defines the crime of dealing in pirated recordings:

"Dealing in pirated recordings is selling or offering for sale or distributing or possessing for the purpose of sale or distribution, any article produced in violation of K.S.A. 21-3748 and amendments thereto, knowing or having reasonable grounds to know that such article was produced in violation of law."

K.S.A. 21-3748, which is referred to in the statute under which Jones was charged, defines piracy of recordings. The applicable portion is as follows:

"(a) Piracy of recordings is knowingly, and without the consent of the owner, duplicating or causing to be duplicated any sounds recorded on a phonograph record, disc, wire, tape, film or other article on which sounds are recorded . . . with the intent to sell, rent or cause to be sold or rented, any such duplicated sounds." K.S.A. 21-3748(a).

In Instruction No. 2, and consistent with K.S.A. 21-3749, the statute under which Jones was charged, the jury was instructed that the State must prove that Jones "knew or had reasonable grounds to know that such recording was produced in violation of law, as set forth in Instruction Number 3."

In Instruction No. 3, and consistent with K.S.A. 21-3748, which is referred to in K.S.A. 21-3749, the jury was instructed: "Kansas

law provides that it is illegal for any person knowingly and without the consent of the owner to duplicate or cause to be duplicated any sounds recorded on a disc, tape, film or other article with the intent to sell, rent or cause to be sold or rented."

Jones does not find any fault with the district court giving Instructions Nos. 2 and 3. Nor does he argue that the evidence was insufficient to convict him of the crime. He complains that the court limited his ability to refute the knowledge element of K.S.A. 21-3749(a). Jones argues that he "elicited testimony that although . . . each of the recordings referenced federal law, none referenced Kansas law. Thus, a jury could reasonably have found that Mr. Jones may have known that the recordings might violate federal law, while at the same time have had no knowledge that they violated Kansas law."

Jones readily admits that he was allowed to elicit testimony refuting the knowledge element of K.S.A. 21-3749(a). There is no claim that the district court excluded evidence on this issue. The issue is the claimed limitation on his closing argument.

Under the state and federal Constitutions, few rights are more fundamental than that of an accused to present his or her own theory of defense. *State v. Gonzales*, 245 Kan. 691, 699, 783 P.2d 1239 (1989) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S. Ct. 1038, 35 L. Ed. 2d 297 [1973]). The Due Process Clause of the Fourteenth Amendment to the United States Constitution requires a criminal defendant to be afforded a "meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U.S. 479, 485, 104 S. Ct. 2528, 81 L. Ed. 2d 413 (1984); see *State v. Irons*, 250 Kan. 302, 309, 827 P.2d 722 (1992).

Not every unfavorable ruling rises to the level of interference with a defendant's constitutional right to present a defense. *State v. Huntley*, 39 Kan. App. 2d 180, 186, 177 P.3d 1001 (2008). The right to present a defense is subject to statutory rules and caselaw interpreting the rules of evidence and procedure. *State v. Wells*, 289 Kan. 1219, 1235, 221 P.3d 561 (2009). Jones' counsel was required to operate under the same constraints that limit all counsel in closing argument.

Jones was charged with violating K.S.A. 21-3749, dealing in pirated recordings. The statute does not define a general intent crime; that is, one in which intentionally doing the prohibited act is sufficient to constitute the crime. See *State v. Diaz*, 44 Kan. App. 2d 870, 873, 241 P.3d 1018 (2010), *rev. denied* 291 Kan. 913 (2011). Here, the State had to prove that Jones dealt in pirated recordings "knowing or having reasonable grounds to know that such article was produced in violation of law." The jury was instructed in Instruction No. 2 that the State had to prove this. The defense was entitled to address in closing argument each element of the charged crime and whether the State has met its burden of proving each element beyond a reasonable doubt. We have read and reread several times the exchange between court and counsel at the instruction conference and do not find any clear expression from the district court that Jones' counsel was not permitted to address in closing argument each element of the charged crime, including the element of knowledge. But if the court's comments are construed as limiting Jones' ability to address the element of knowledge in his closing argument, we conclude any error was harmless.

A violation of a defendant's constitutional right to present a complete defense is subject to a harmless error analysis. See K.S.A. 60-261; *State v. King*, 293 Kan. 1057, 1068, 274 P.3d 599 (2012). As stated in *State v. Ward*, 292 Kan. 541, 569, 256 P.3d 801 (2011):

"If the fundamental failure does infringe upon a right guaranteed by the United States Constitution, the trial court should apply the constitutional harmless error analysis defined in *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 (1967), in which case the error may be declared harmless where the party benefitting from the error proves beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, proves there is no reasonable possibility that the error affected the verdict."

To begin with, Jones was not restricted in the presentation of any testimony on the issue of knowledge. At closing argument, all the evidence was before the jury, and the role of counsel was simply to comment on the significance or inadequacy of that evidence and how it fit into each party's theory of the case. In closing argument

counsel is confined to commenting on the facts in evidence and the reasonable inferences that can be drawn from those facts, as well as how those facts are to be applied under the court's instructions. See *State v. Heath*, 264 Kan. 557, 583, 957 P.2d 449 (1998).

Examining the evidence from every possible angle, we are unable to determine how any limitation on the closing argument of Jones' counsel possibly could have changed the outcome of the trial. It is important to recall that Jones does not challenge the sufficiency of the evidence to support his conviction under K.S.A. 21-3749. Thus, he concedes that there was ample evidence that he knew or had reason to know that the DVDs he gave Stone were produced in violation of law.

Generally, citizens of a state are presumed to know that the legislature has made certain conduct illegal. *State v. Cook*, 286 Kan. 766, 775, 187 P.3d 1283 (2008) (citing *Cheek v. United States*, 498 U.S. 192, 199, 111 S. Ct. 604, 112 L. Ed. 2d 617 [1991]); see *State ex rel. Murray v. Palmgren*, 231 Kan. 524, 536, 646 P.2d 1091 (1982) (ignorance of the law is no excuse for violation); *State v. Young*, 228 Kan. 355, 360, 614 P.2d 441 (1980) (all persons are presumed to know general public laws of the state where they reside, as well as the legal effects of their acts).

Jones has no burden to show that any error in limiting closing argument affected the outcome of the trial. The burden rests with the State to show that the error did not affect the trial's outcome. But the State raised the harmless error argument in its brief, and we have nothing from Jones in reply suggesting how the outcome could have been different.

The State had the burden of proving that Jones knew or had reason to know that the discs he gave Stone were produced in violation of law. Based on our examination of the evidence on this point and the reasonable inferences that can be drawn from the evidence, all as recounted above from the trial testimony, we find the evidence on this point to be overwhelmingly against Jones. We are confident that the outcome of the trial was not affected by any limitation on Jones' closing argument.

*Jury Instructions*

Jones argues that his conviction must be reversed because Instruction No. 7 directed a verdict on the knowledge element of K.S.A. 21-3749(a).

"When a party has objected to an instruction at trial, the instruction will be examined on appeal to determine if it properly and fairly states the law as applied to the facts of the case and could not have reasonably misled the jury. In making this determination an appellate court is required to consider the instructions as a whole and not isolate any one instruction. [Citations omitted.]" *State v. Appleby,* 289 Kan. 1017, 1059, 221 P.3d 525 (2009).

Over Jones' objection, the district court provided the jury with Instruction No. 7, which states: "Proof of criminal intent does not require proof of knowledge of the existence or constitutionality of the statute under which the accused is prosecuted, or the scope or meaning of the terms used in that statute." This instruction mirrors the language of K.S.A. 21-3202(1).

Jones was charged under K.S.A. 21-3749(a) with dealing in pirated recordings "knowing or having reasonable grounds to know that such article was produced in violation of law." Jones argues that Instruction No. 7 relieved the State of having to prove beyond a reasonable doubt the knowledge element of K.S.A. 21-3749(a) and essentially directed a verdict on that element. Jones argues the erroneous instruction violated his right to have the jury determine guilt beyond a reasonable doubt on every element of the charged offense.

We agree that the State was required to prove that Jones had actual knowledge or reasonable grounds to know that the DVDs he gave Stone were produced in violation of law. However, K.S.A. 21-3749(a) does not contain an element requiring the State to prove that Jones had knowledge of the existence of that particular statute. Jones need only have a generalized knowledge or reason to believe that what he was doing was against the law. Instruction No. 7 accurately states the law and does not obviate the State's need to establish the knowledge element of K.S.A. 21-3749(a).

Jones compares this case to *State v. Brice,* 276 Kan. 758, 80 P.3d 1113 (2003). In *Brice,* the victim received a "through and through" bullet wound. To sustain a conviction, the State was required to

prove that the defendant intentionally caused great bodily harm to the victim. The district court instructed the jury that the term "great bodily harm" meant a "through and through" bullet wound. See 276 Kan. at 760, 771. Our Supreme Court determined that the district court erred in instructing the jury that the fact of great bodily harm, which was essential to support a conviction, had been established as a matter of law by the evidence of the "through and through" bullet wound. 276 Kan. at 773-74.

Unlike in *Brice*, the district court here did not identify specific evidence and instruct the jury that such evidence satisfied the State's burden regarding an element of the offense. Instruction No. 7 did not invade the jury's role as factfinder. Taking the instructions as a whole, as we are required to do, we do not find that the jury was misled by Instruction No. 7. The jury still had the task of determining whether Jones knew or had reason to know that his dealing in pirated DVDs was against the law. Instruction No. 7 did not relieve the State of its obligation to prove each and every element of the charge offense.

## Claimed Prosecutorial Misconduct

Jones claims that the State committed prosecutorial misconduct and violated his right to a fair trial when it went beyond the scope of the direct examination of Gallagher and pursued a line of questioning dealing with domestic violence.

The State called Stone to testify on the first day of its case-in-chief. In its direct examination the State elicited testimony from Stone that Jones was the father of her 9-year-old daughter. Stone saw Jones several times a week, including the day before she testified, for parenting visits. She testified that she had a great relationship with Jones, who was a "great father" and provided both financial and emotional support.

On the second day of trial the State called Sergeant Gallagher to testify regarding the statements Stone and the other women gave at the time of the original investigation. The following exchange occurred on the State's redirect examination of Gallagher:

"Q: In terms of the second interview with Ms. Stone, in your opinion was she in favor of law enforcement getting involved in this matter against [defendant]?

"A: No, she was not.

"Q: In your years as a law enforcement officer, have you ever been engaged in—in cases of domestic dispute or domestic violence?

"A: Absolutely.

"[DEFENSE COUNSEL]: Objection, Your Honor. This is outside the realm.

"THE COURT: Counsel, approach.

(At this time, a bench conference was held out of the hearing of the court reporter, after which continued the proceedings as follows:)

"THE COURT: I will sustain the objection. Rephrase it, please.

"Q: [By the prosecutor] Have you ever been involved in any sort of domestic disputes during domestic cases?

"A: Have I been involved personally?

"Q: Yes.

"A: No.

"THE COURT: Counsel approach.

(At this time, a bench conference was held out of the hearing of the court reporter, after which continued the proceedings as follows:)

"Q: [By the prosecutor] My apologies, Lieutenant—or, Sergeant, I think I poorly phrased it. Not you personally, but professionally, have you ever been as a law enforcement officer involved in investigating or participating in the investigation of a domestic dispute or domestic violence?

"A: Absolutely.

"Q: In that regard, in such cases, is it your experience, your professional opinion, have you experienced that there are mood shifts or mood swings in such cases?

"A: Absolutely.

"Q: And is there shifts in cooperation by witnesses in those kind of cases?

"A: Absolutely."

The following exchange occurred on Jones' recross-examination of Gallagher:

"Q: Okay. You also had some questions regards to your experience of domestic violence. Was there any allegation of domestic violence in this case?

"A: No, sir.

"Q: Any evidence that it had occurred?

"A: No, sir.

"Q: Was occurring?

"A: No, sir.

"Q: Was an issue?

"A: No, sir."

Finally, during the State's closing argument the prosecutor stated:

"Second, let's talk about what we're doing here. We're prosecuting [Stone's] child's father. Somebody, you know, we talked about, I asked you about domestic issues. I never suggested or implied that there was any kind of domestic distur-bance. To the contrary, I think they have a great relationship. They told you back then they saw each other virtually every day. That there is financial support in terms of the child. There is logistical support in terms of he helps her do all these things. In terms of picking up the children and dropping them off. To some degree she even said, at least if nothing else for the child's sake, the emotional connection there. She keeps that because she thinks that is important to have that connection with the dad.

"So now you have her not being pretty much pro-prosecution in this case, coupled with the fact the person we're prosecuting is somebody she's close to. In fact when asked back then, she said I see him almost virtually every day. And when asked Monday, when was the last time you saw him, she said Sunday, the day before. So, yeah, I bet they have a great relationship. You think that has an impact again with what I said earlier in terms of how she's going to testify?"

Jones claims he was denied a fair trial because the State inter-jected a nonissue of domestic violence for which there was no ev-identiary basis, all in the hopes of discrediting Stone's testimony about Jones not knowing that she was selling the DVDs and Jones refusing to take money for them.

The State argues that this issue has not been properly preserved for appellate review due to Jones' failure to make a specific con-temporaneous objection to the State's questions as required by K.S.A. 60-404 and *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 (2009). The requirement of a specific contemporaneous objection applies to prosecutorial misconduct claims arising from the im-proper introduction of evidence. *State v. Shadden*, 290 Kan. 803, 835, 235 P.3d 436 (2010).

Here, we construe defense counsel's objection to be that the question was beyond the scope of cross-examination. We do not know if any other objection was raised at the bench conference because the court sustained the objection and allowed counsel to rephrase the question, indicating that the objection was simply to the form of the question, an objection inconsistent with the claim now being made on appeal. Whatever other objection Jones raised at the bench conference has not been preserved for our review, and Jones has the burden of providing a record of the proceedings demonstrating the error he now claims. See *State v. Moncla*, 262

Kan. 58, 68, 936 P.2d 727 (1997) (defendant has burden to invite court reporter to record substance of sidebar conference).

In any event, after the question was rephrased the court called counsel to the bench a second time, after which the prosecutor rephrased the question again, apparently at the court's direction. This seems to confirm that Jones' prior objection had not been substantive but rather merely to the form of the question. Jones' counsel made no further objection to the testimony.

K.S.A. 60-404 and *King*, 288 Kan. at 349, require a timely and specific objection to evidence. The only objection Jones raised at trial was not specific to the issue he now raises, and he made no objection whatsoever to the rephrased questions. Jones has failed to properly preserve this issue for appeal.

Even if the issue had been properly preserved, we are satisfied that the prosecutor's questions did not affect the outcome of the trial. The State characterizes the prosecutor's questions as inartful. We characterize them as improper. But defendants are not entitled to a *perfect* trial. (Every practitioner at the bar will agree that such an event is rare indeed.) Defendants are entitled to a *fair* trial. Here, the prosecutor's questions did not so taint the trial as to require us to set aside the jury's verdict.

In making this determination we examine the prosecutor's questions in light of the record as a whole. *State v. Garcia*, 282 Kan. 252, 270, 144 P.3d 684 (2006). There was evidence of Stone's good relationship with Jones, the father of her 9-year-old child. Jones reiterated the point in the recross questioning that immediately followed the prosecutor's questions. The prosecutor then emphasized Stone's close relationship with Jones in closing argument and made it clear that there was no violent relationship between Stone and Jones. To the contrary, the prosecutor asked the jury to consider Stone's close relationship to Jones in weighing her credibility with respect to her testimony given at trial that varied from the statement she gave the police. Further, there is no evidence of ill will in the prosecutor's questions. He asked the question once, drew an objection apparently to the form of the question, rephrased the question at the court's direction, and proceeded accordingly without any further objection. We are satisfied this ill-

conceived but isolated inquiry into the issue of domestic violence had no likelihood of altering the outcome of the trial. See *State v. Boggs*, 287 Kan. 298, 319, 197 P.3d 441 (2008).

*Alternative Means*

Jones claims the district court instructed the jury on various alternative means by which the law was violated when producing the recordings. Jones argues that his right to a unanimous verdict was not protected because the State failed to present evidence to support each of the alternative means upon which the district court instructed the jury.

Jury unanimity on guilt is statutorily required. K.S.A. 22-3421. In an alternative means case, the jury must be unanimous as to guilt for the single crime charged but need not be unanimous as to the particular means by which the crime was committed, so long as substantial evidence supports each alternative means. *State v. Wright*, 290 Kan. 194, 201-02, 224 P.3d 1159 (2010).

Jones' argument is based on the alternative means of committing the crime of piracy of recordings, K.S.A. 21-3748. But Jones was charged, instructed, and convicted of *dealing in* pirated recordings in violation of K.S.A. 21-3749(a). The jury was instructed in Instruction No. 9 that its verdict must be unanimous. We presume that the jury followed this instruction. See *State v. Becker*, 290 Kan. 842, 856, 235 P.3d 424 (2010). Because the jury was instructed as to one means of dealing in pirated recordings, we have no doubt that the jury's verdict was unanimous.

*Cumulative Error*

It is a close call whether Jones properly preserved his claim of error in limiting closing argument. We resolved that question in his favor but had difficulty finding any clear expression of the court which limited Jones' closing argument. We concluded, however, that if Jones was so limited, it was error, albeit harmless, to do so.

With respect to the claimed prosecutorial misconduct, Jones did not properly preserve that issue for appeal. Nevertheless, we concluded that Jones was not harmed by the prosecutor's brief but ill-conceived questions about domestic violence.

The issue is whether the cumulative effect of what are at most harmless errors was so great as to require reversal. The test is "whether the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant. [Citation omitted.]" *State v. Edwards*, 291 Kan. 532, 553, 243 P.3d 683 (2010).

Our examination of the record as a whole leads us to conclude that these two incidents during the course of the trial did not deprive Jones of a fair trial. Jones is not entitled to relief under the cumulative error doctrine.

*Restitution*

Finally, Jones argues the district court did not have jurisdiction to order restitution after the date of sentencing. He contends that restitution is a part of the sentence and cannot be ordered or modified after the district court has imposed a lawful sentence.

The district court stated that it would leave the matter of restitution open for 30 days. A journal entry reflecting the final amount of restitution was filed 2 months after the sentence was imposed. Therefore, Jones argues in the alternative that the district court lost jurisdiction 30 days after sentencing.

The sentencing court is allowed to reserve restitution issues for a later determination after sentence has been imposed. *State v. McDaniel*, 292 Kan. 443, 447-48, 254 P.3d 534 (2011); *State v. Cooper*, 267 Kan. 15, 18, 977 P.2d 960 (1999); *State v. Bryant*, 37 Kan. App. 2d 924, Syl. ¶ 4, 163 P.3d 325, *rev. denied* 285 Kan. 1175 (2007). In both *Cooper* and *Bryant*, the district courts left the matter of restitution open for 30 days, but restitution was not imposed until approximately 6 months later. In both cases, the award of restitution was upheld. We are duty bound to follow Kansas Supreme Court precedent, absent some indication the court is departing from its previous position. *State v. Merrills*, 37 Kan. App. 2d 81, 83, 149 P.3d 869, *rev. denied* 284 Kan. 949 (2007). Based on controlling precedent, this claim of error fails.

Affirmed.

* * *

ATCHESON, J., concurring: The majority correctly concludes Defendant Antonio Jones has advanced no grounds requiring reversal of his conviction, and I join in that result. I address two points: the interpretation of K.S.A. 21-3749, proscribing "dealing in pirated recordings"; and the prosecutor's examination of Sergeant Gallagher injecting the issue of "domestic violence" into this case. I would construe the statute somewhat differently than the majority does. And the majority, in my view, glosses over the seriousness of the prosecutor's misconduct.

*Piracy Statute*

The majority interprets K.S.A. 21-3749 to include an element requiring the defendant to know or have reason to know that the way the recordings were produced was against the law. I don't read the statute to require that knowledge. The defendant must know or have reason to know that the recordings were made in the manner criminalized in K.S.A. 21-3748, the companion statute prohibiting "piracy of recordings." The defendant need not appreciate that the making or production of the recordings was, in fact, illegal.

The Kansas appellate courts apparently have never construed either of the recording piracy statutes. They were adopted at the same time and should be considered together. Dealing in pirated recordings under K.S.A. 21-3749 specifically outlines the prohibited conduct as requiring trafficking in recordings produced in violation of the companion piracy statute, K.S.A. 21-3748.

Under K.S.A. 21-3748, a person may not duplicate a recording for purposes of selling, renting, or otherwise profiting from the copy without the consent of the owner. The statute specifically protects the sounds contained in the recordings, regardless of the medium used to present them, *e.g.*, disc, film, or tape. The owner is the person or entity holding legal rights in the audio material contained in the recording. Thus, copying a DVD or a CD with the intent to sell the copy violates K.S.A. 21-3748 if the owner of the music or other sounds has not given permission. In turn, K.S.A. 21-3749, under which Jones was convicted, prohibits a person from distributing such a copy for financial gain or possessing it for that

purpose "knowing or having reasonable grounds to know that such article was produced in violation of the law."

I would submit K.S.A. 21-3749 requires: (1) the copy to be produced for financial gain without the owner's permission; and (2) the distributor knows or has reason to know that it was produced for financial gain without the owner's permission. Whether the distributor knows or suspects that course of conduct to be illegal is irrelevant. The language requiring the distributor to know or have reason to know how the recording was produced was not intended to change the general rule that ignorance of a criminal statute affords no defense to the crime. K.S.A. 21-3202(1) (Under the Kansas Criminal Code, "criminal intent" does not require proof the defendant has knowledge of the statute criminalizing the conduct.); K.S.A. 21-3203(1) (Ignorance of the law may be a defense if it "negates" a mental state specifically made an element of the offense.).

I believe the legislature meant to shield a distributor from criminal liability if he or she had no reason to suspect the recordings were produced in anything other than a legitimate fashion under a licensing agreement with the owner. That is, if the packaging, appearance, and content of the pirated recordings were essentially indistinguishable from legitimately produced recordings of the same material and the distributor acquired them in a commercially reasonable way, the distributor would have a defense to violating K.S.A. 21-3749. (The distributor might not, for example, if he or she bought 100 DVDs of a movie still in the theaters from someone selling them off the back of an unmarked truck at midnight for half the usual price of new releases.) That construction permits a defense based on a mistake of fact, something relatively commonplace. See *State v. Diaz*, 44 Kan. App. 2d 870, 873-74, 241 P.3d 1018 (2010) (discussing nature and scope of mistake of fact as defense), *rev. denied* 291 Kan. 913 (2011); *General v. State*, 367 Md. 475, 483-84, 789 A.2d 102 (2002) (noting general rule that a mistake of fact affords a defense to a crime if it negates the culpable mental state the government must prove).

The statute was not intended to afford a defense to a distributor selling patently homemade or otherwise obviously bootlegged re-

cordings on the grounds that he or she had no idea it might be illegal under Kansas law to make a buck that way. But that is how the majority reads the statute. The majority, then, finds a defense based on a mistake of law—a comparative rarity. See *State v. Watson*, 273 Kan. 426, 434-35, 44 P.3d 357 (2002) (noting " 'the deeply-rooted principle' " that " 'ignorance of the law or a mistake of law' " does not furnish a defense to criminal prosecution).

So, in my view, the majority construes the statute more favorably to Jones than the language actually requires. Given what I believe to be the correct interpretation, Jones had no legal basis to argue to the jury that his ignorance of the law or his failure to appreciate the illegality of his conduct amounted to a defense. In turn, there could be no error in any limitation the district court put on his making that argument. I, therefore, agree with the majority that Jones suffered no legal detriment based on the permitted scope of his lawyer's closing argument.

Interpreting the "knowing" clause of K.S.A. 21-3749 is hardly free from doubt. The language is unusual in the Kansas Criminal Code. Similar phrasing appears in K.S.A. 21-4303(a), criminalizing the knowing management or operation of bingo games in violation of the law, but the appellate courts have not construed that provision either.

Roughly comparable language turns up in some federal criminal statutes. In *United States v. International Min'ls Corp.*, 402 U.S. 558, 559-60, 562, 91 S. Ct. 1697, 29 L. Ed. 2d 178 (1971), a divided United States Supreme Court held that 18 U.S.C. § 834, a criminal statute punishing anyone "who knowingly violates any such regulation" adopted by the Interstate Commerce Commission governing the transportation of corrosive liquids, did not make the defendant's knowledge of the regulation an element of the offense. The majority concluded the " 'knowingly' violate" language should be "construed as a shorthand designation for specific acts or omissions which violate the Act." 402 U.S. at 562. And the statute, thus construed, would be applied in conformity with "the rule that ignorance of the law is no excuse." 402 U.S. at 562. The majority found no obligation upon the government to prove a defendant knew of the regulation to convict. 402 U.S. at 563. But a defendant

could rely on a mistake of fact as a defense—he or she honestly believed the transported liquid was distilled water rather than sulfuric acid. 402 U.S. at 563-64. Three dissenting justices would have read the statute as requiring actual knowledge of the regulation to convict. 402 U.S. at 565 (Stewart, J., joined by Harlan and Brennan, JJ., dissenting).

Federal courts have since applied the same construction to other similarly worded statutes. See, *e.g.*, *United State v. Lynch*, 233 F.3d 1139, 1141-42 (9th Cir. 2000) (violation of Archeological Resources Protection Act, 16 U.S.C. § 470ee[a] [1994]); *United States v. Wilson*, 133 F.3d 251, 260-62 (4th Cir. 1997) (discharge of fill dirt into wetlands in violation of Clean Water Act, 33 U.S.C. §1319 [c][2][A] [1994], criminally punishing "anyone who *knowingly violates* section 1311"). The detailed discussion in *Wilson* is instructive. The court cited the construction applied in *International Min'ls* and found it transferred readily to the Clean Water Act to establish that the government need not prove the defendant knew his or her conduct to be illegal to convict. *Wilson*, 133 F.3d at 261-62. The court pointed out that a contrary interpretation would run counter to the longstanding principle that ignorance of the law provides no defense and that congressional deviation from a principle of that sort should not be lightly inferred. 133 F.3d at 261-62. Those considerations also weigh against the majority's interpretation of K.S.A. 21-3749.

I hesitate to read too much into the chronology of the United State Supreme Court's ruling and the adoption of the Kansas antipiracy statutes. But *International Min'ls* was decided in 1971, and K.S.A. 21-3749 was enacted 5 years later. It is hardly unreasonable to suggest the Kansas Legislature was aware of that decision and took account of the decision in adopting the language of the antipiracy statute. See *Wilson*, 133 F.3d at 263 (finding adoption of particular language in Clean Water Act after *International Min'ls* to be of some import in construing that language). More to the point, perhaps, had the Kansas Legislature intended to require proof that a defendant actually knew making unauthorized copies of recordings for profit violated the Kansas statute, it would have used different language, especially after *International Min'ls*. The

legislature might have phrased the provision as "knowing or having reason to know of the specific prohibition in K.S.A. 21-3748" or "knowing or having reason to know of K.S.A. 21-3748."

On balance, I would opt for a reading of K.S.A. 21-3749 that permits a mistake-of-fact defense but not a distinctly uncommon mistake-of-law defense and, thus, hews to settled doctrine in rejecting ignorance of the law as an excuse. The reading I propose would be consistent with comparable federal authority. And it would afford a defense to the honest distributor mistakenly handling sophisticated bootlegs but not to Jones or others like him. That distributor seems more deserving of a defense than the individual knowingly trafficking in counterfeit recordings for profit but disclaiming any knowledge of the specific Kansas statute criminalizing that conduct. The deliberate trafficker is, at the very least, blameworthy as a cheat. Absent the clearest of signals from the Kansas Legislature, he or she ought not escape criminal penalties by pleading empty-headedness. I do not find that signal in K.S.A. 21-3749.

*Prosecutor's Questions*

In this case, the prosecutor questioned Officer Gallagher, one of the lead investigators, in a way that directly raised the specter of domestic violence and suggested that Serena Stone, the mother of Jones' child, was the victim of such abuse at the hands of Jones. The line of questioning apparently was intended to explain why Stone gave testimony at trial favorable to Jones and in conflict with what she had supposedly told Officer Gallagher during the investigation. That is, she feared Jones would abuse her if she didn't change her story. But the record strongly indicates the prosecutor lacked any factual basis to conclude Stone had been the victim of domestic violence and, therefore, had absolutely no legitimate basis to pose the questions. See *State v. McCaslin*, 291 Kan. 697, Syl. ¶ 12, 245 P.3d 1030 (2011) ("A prosecutor may not make assertions of fact in the form of a question to a witness absent a good-faith basis for believing the asserted matters to be true.").

At trial, Stone testified that she and Jones had known each other for years and had a 9-year-old daughter together. Jones provided

financial and emotional support to Stone and their daughter. He typically saw them three times a week. Stone testified that she and Jones had not had an intimate, marital-like relationship for several years.

As outlined in the majority opinion, Stone had sold copies of movies Jones had made. At trial, she testified that she kept the money. But Officer Gallagher testified that she had told him that she gave the money to Jones. Jones' receipt of money for the DVDs he made was a crucial part of proving the charge against him. So the prosecutor wanted to discredit Stone's trial testimony.

The prosecutor chose to do so through the questions about domestic violence. As set forth in the majority opinion, the prosecutor asked several questions eliciting testimony from Officer Gallagher that victims of domestic violence often change their accounts of events. Jones' lawyer then examined Officer Gallagher and established that there was no evidence that Jones had ever physically abused Stone. In closing argument, the prosecutor more or less disavowed the questions he had asked.

Having reviewed the trial record, I agree with the majority that the lawyer for Jones failed to lodge a sufficient objection to the questions for us to review the issue for reversible error. The lawyer made one general objection to the first question referring to domestic violence. The specifics of the objection and the district court's ruling were made off the record. The prosecutor then continued the line of questioning with Officer Gallagher without further objection. Jones' lawyer then defused the issue to some extent with his questions. The judge was not asked to instruct the jury to disregard the prosecutor's questions and Gallagher's answers.

Jones' lawyer might have considered that approach to be the most effective way of handling the matter, and a legitimate argument could be made for it. But whatever the reason, studied or not, the result failed to preserve any claimed error for appellate review. Without any additional objection or a request for a curative instruction, Jones' trial lawyer failed to give the district court an opportunity to remedy any harm. And without a record on the first objection, we cannot evaluate it or the trial court's ruling for error.

None of that, however, detracts from the deliberate, flagrant misconduct on the prosecutor's part. The improper inquiry was not a slip of the tongue or a single, poorly phrased question that could be excused as the occasional byproduct of the unscripted give-and-take of trial practice. The prosecutor deployed a calculated line of questions aimed at discrediting Stone as a victim of Jones' violence and someone fearful of more of the same if she didn't change her testimony. He seemingly did so without regard for the truth of that suggestion.

In closing argument to the jury, the prosecutor acknowledged Stone and Jones "have a great relationship." The prosecutor went on to indicate Stone's reliance on Jones for financial and emotional support might have caused her to change her story on the witness stand—not because she feared him but because she retained a genuine affection for him and depended upon him.

Showing that a witness has warm feelings toward a party or benefits financially from a party are legitimate bases to challenge the veracity of testimony. See *State v. Scott*, 39 Kan. App. 2d 49, 56, 177 P.3d 972 (2008) ("One of the methods or techniques for attacking the credibility of a witness is to show partiality, including bias, motive, and interest in the outcome."). The prosecutor certainly could have done so in questioning Stone or possibly Officer Gallagher. But the prosecutor could not have taken the tack he did by substituting an apparently unfounded basis to challenge Stone's honesty for a legitimate one that might be considered less effective and almost certainly less dramatic.

Given the record, I must agree with the majority that the prosecutor's misconduct fails to furnish a basis to reverse the conviction.