**Electronically Filed
Supreme Court
SCAP-13-0002266
22-DEC-2015
08:33 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---oOo---

THE SIERRA CLUB and SENATOR CLAYTON HEE,
Petitioners/Appellants-Appellants,

vs.

D.R. HORTON-SCHULER HOMES, LLC, a Delaware limited liability
company, d.b.a. D.R. HORTON-SCHULER DIVISION; THE LAND USE
COMMISSION OF THE STATE OF HAWAI'I; OFFICE OF PLANNING, STATE OF
HAWAI'I; DEPARTMENT OF PLANNING AND PERMITTING,
Respondents/Appellees-Appellees.

SCAP-13-0002266

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CAAP-13-0002266; CIV. NO. 12-1-2000-07)

DECEMBER 22, 2015

RECKTENWALD, C.J., NAKAYAMA AND McKENNA, JJ.,
AND CIRCUIT JUDGE CHANG, IN PLACE OF ACOBA, J., RECUSED;
WITH POLLACK, J., DISSENTING

OPINION OF THE COURT BY McKENNA, J.

I.    **Introduction**

This appeal involves a long-standing issue in this state:

balancing agricultural and urban land uses. Appellants Sierra

Club and Clayton Hee challenge the Land Use Commission's ("LUC")
reclassification of approximately 1525.516 acres of Appellee
D.R. Horton-Schuler Homes' ("D.R. Horton-Schuler") land from the
agricultural state land use district to the urban state land use
district.  The land is slated for development of the Hoʻopili
project.  On transfer from the Intermediate Court of Appeals,
Appellants seek review of the Decision and Order of the Circuit
Court of the First Circuit[1] ("circuit court") affirming the LUC's
Findings of Fact, Conclusions of Law, and Decision and Order
("D&O") and dismissing their appeal.

Appellants argue that the reclassification violated Article
XI, Section 3 of the Hawaiʻi State Constitution, which provides
the following:

> The State shall conserve and protect agricultural lands,
> promote diversified agriculture, increase agricultural
> self-sufficiency and assure the availability of
> agriculturally suitable lands. The legislature shall
> provide standards and criteria to accomplish the foregoing.
>
> Lands identified by the State as important agricultural
> lands needed to fulfill the purposes above shall not be
> reclassified by the State or rezoned by its political
> subdivisions without meeting the standards and criteria
> established by the legislature and approved by a two-thirds
> vote of the body responsible for the reclassification or
> rezoning action.

Appellants also argue that the reclassification violated
Act 183, codified at Hawaiʻi Revised Statutes ("HRS") §§ 205-41
through -52 (Supp. 2005), and also known as Part III of HRS

---

[1]    The Honorable Rhonda A. Nishimura presided.

chapter 205 ("Part III").  Part III implements Article XI, Section 3's mandate and governs land use on important agricultural lands ("IALs").  Appellants contend that the LUC should not reclassify lands that the City and County of Honolulu could potentially designate as IALs in the future, pursuant to HRS § 205-47 (Supp. 2005).

Lastly, Appellants argue that the reclassification violated Hawaiʻi Administrative Rules ("HAR") § 15-15-77(a) (effective 2000-2013), which requires reclassifications to conform to the Hawaiʻi State Plan.  They also contend that the reclassification violated HAR § 15-15-77(b)(6) (effective 2000-2013), which requires the LUC to consider whether taking land in "intensive agricultural use for two years prior to the date of a filing of a petition [for a district boundary amendment] or lands with a high capacity for intensive agricultural use" out of the agricultural district "[w]ill not substantially impair actual or potential agricultural production in the vicinity of the subject property or in the county or State; or . . . [i]s reasonably necessary for urban growth. . . ."

Pursuant to Save Sunset Beach Coalition v. City & County of Honolulu, 102 Hawaiʻi 465, 476, 78 P.3d 1, 12 (2003), Article XI, Section 3, standing alone, is not self-executing; rather, its mandate is carried out through the provisions of Part III.

Therefore, the plain language of Article XI, Section 3 does not require the LUC to stay reclassification of agricultural land while the formal county-initiated IAL designation process runs its course.  Pursuant to the policies underlying Part III, state and county government should consider the "compelling state interest in conserving the State's agricultural land resource base assuring the long term availability of agricultural lands for agricultural use," see HRS § 205-41 (Supp. 2005); however, the plain language of Part III contains no provision requiring a stay.  Further, the constitutional history of Article XI, Section 3, as well as the legislative history of Part III, does not reveal an intent to require the LUC to delay reclassifying agricultural land pending formal designation of IALs.  Second, reliable, probative, and substantial evidence supported the LUC's finding that the reclassification of the land at issue in this case was consistent with the Hawaiʻi State Plan, would not substantially impair agricultural production, and was necessary for urban growth.  We therefore affirm the circuit court's decision and order, which affirmed the LUC's D&O.

## II.  Background

### A.    Land Use Commission Proceedings

#### 1.    D.R. Horton-Schuler's Petition for Land Use District Boundary Amendment

On January 24, 2007, D.R. Horton-Schuler filed a Petition for Land Use District Boundary Amendment ("Petition") before the LUC.  D.R. Horton-Schuler described the Hoʻopili project as follows:

> Petitioner is currently proposing the development of a mixed-use, transit-ready community, including residential, business, and commercial areas, transit stops, schools, parks and open space. Petitioner is proposing to develop approximately 11,750 residential units (including affordable units) ranging from an estimated $200,000 to $700,000 based upon 2006 market prices, a minimum of five (5) school sites (subject to continued negotiations with the Department of Education), approximately two hundred ten (210) acres for parks and open space, and approximately one hundred forty-five (145) acres for business and commercial spaces that would sell for approximately $35 to $45 per sq. ft. in today's market. Both the residential and commercial space selling prices are estimates and are subject to change according to fluctuating market conditions, as well as unanticipated costs incurred during construction. The Proposed Project is being designed as a mixed-use community ready to provide high-capacity transit stops to further encourage walking/bicycling and the use of public transportation to supplement that which already underpins Hoʻopili's traditional neighborhood design. Infrastructure facilities to be expanded or improved include access and circulation roadways, drainage systems, water distribution and wastewater collection lines, and electrical/communication systems.

The Hoʻopili project is scheduled to be developed in two ten-year phases, the first phase from 2013-2020, and the second phase from 2020-2030.[2]

---

[2]    Under HAR § 15-15-78 (effective 2000-2013), the LUC can reclassify lands incrementally if "full development of the subject property cannot
(continued. . .)

5

The Petition stated that the land was "currently leased for agricultural purposes," including "diversified agriculture; pasturage; grazing for livestock; cultivation of seed corn and other agricultural crops; and agricultural research." The Final Environmental Impact Statement ("FEIS") prepared in conjunction with the Petition represented that D.R. Horton-Schuler would be relocating the agricultural tenants onto replacement lands.

The FEIS also noted that the proposed project conformed to the Hawai'i State Plan. The FEIS pointed out that the Petition lands were "located within (and makai of) the Urban Growth Boundary of the Ewa Development Plan Urban Land Use Map." The FEIS represented that the project "is consistent with the State's goal to insure [sic] economic stability, diversity, and growth for present and future generations," because the project "will provide various housing and employment opportunities for the rapidly growing 'Ewa region, which will in turn, relieve development pressures from other areas of O'ahu, particularly the Primary Urban Center, and rural areas such as Wai'anae, North Shore, Ko'olau Loa and Ko'olau Poko." The FEIS noted, "The agricultural policies [of the Hawai'i State Plan] are predominantly not applicable to the Ho'opili project."

_____

(. . .continued)
substantially be completed within ten years after the date of" the LUC's approval.

### 2.    Intervenors and Other Parties to the Petition Proceedings and Their Positions

When an "[a]mendment[] to district boundaries involving land areas greater than fifteen acres" is filed with the LUC, the State Office of Planning ("OP") and the county planning department, here the City and County of Honolulu's Department of Planning and Permitting ("DPP"), must appear as parties and "make recommendations relative to the proposed boundary change." HRS § 205-4(e)(1) (2001). The DPP supported the Petition because it found the project to be consistent with the City's General Plan, which "encourages development and growth and directs economic activity within the secondary urban center and urban fringe area in Ewa."  The DPP noted that the project is located within the Urban Growth Boundary of the ʻEwa Development Plan, where urban development is "allowed and consistent with the long-range vision, policies, principles and guidelines in the Ewa Development Plan regarding land use and the plan's vision of building master planned residential communities that allow residents to live and work in the Ewa region."  The OP generally supported the orderly development of Kapolei as Oahu's second city but did not initially take a position on the Petition, citing insufficient information.  Four years into the Petition proceedings, the Sierra Club and Clayton Hee, in his individual capacity only, were permitted to intervene.  Both opposed the

Petition, arguing it proposed inappropriate uses for productive agricultural land.

### 3.    Evidentiary Hearings

The LUC held evidentiary hearings on the Petition on March 19, 2009; March 20, 2009; May 15, 2009; June 25, 2009; June 26, 2009; October 20, 2011; October 21, 2011; November 17, 2011; November 18, 2011; January 5, 2012; January 19, 2012; March 1, 2012; March 2, 2012; March 15, 2012; and March 16, 2012.

### a. Evidence and Testimony on Agricultural Impacts

D.R. Horton-Schuler called Bruce Plasch, who was admitted as an "expert in the field of agricultural economics."  D.R. Horton-Schuler also submitted Plasch's written direct testimony and supplemental written direct testimony.  First, Plasch described the agronomic conditions of the Petition area as follows, starting with soil conditions:

> About 1,340 ± 65 acres of the Petition Area are comprised of higher-quality soils (I and II for the NRCS ratings, Prime for ALISH, and A and B for the LSB).  This is about 2.4% of the 55,563 acres of Prime agricultural lands that Oʻahu had in 1977, and about 2.5% of the 53,039 acres of A and B lands that Oʻahu had in 1972.

In his supplemental written testimony he described agricultural productivity at Hoʻopili as follows:

> In 2010, the primary crops grown at Hoʻopili were bananas, basil, snap beans, broccoli, cabbage, seed corn, sweet corn, cucumbers, eggplant, lettuces, melons, dry onions, bell peppers, squash, pumpkin, and tomatoes.  This includes crops grown for the local market as well as for export. For vegetables, melons and fruits, about 1,027 acres were harvested with an estimated yield of 15.3 million pounds.

8

This represented about 6% of Hawaii's production of these crops.

Second, Plasch testified that the contraction of plantation agriculture has released hundreds of thousands of acres of farmland:

> During the past four decades, a vast amount of farmland has become available for diversified crop farming due to the contraction of plantation agriculture. In 1980, we had 17 large plantations in Hawaii that produced sugar and pineapple for export: 14 sugar plantations and 3 pineapple plantations. Now we have just one, the HC&S sugar plantation on Maui (Dole's pineapple operation remains on Oahu, but it is no longer a large plantation growing pineapple for export, but a farm that grows pineapple primarily for the Hawaii market.)
>
> In actual acreages, the contraction of plantation agriculture released about 263,000 acres of farmland from 1968 to 2009. However, despite the availability of such farmland, the demand for land for diversified crops over the same period increased only by about 26,800 acres (about 10% of the land released from plantation agriculture).
>
> Oahu experienced a similar trend. Since 1960, plantation agriculture released about 73,500 acres on Oahu, while acreage in diversified crops increased only by about 2,300 acres (about 3% of the land released from plantation agriculture).

Third, Plasch estimated that about 177,000 ± 5,000 acres of farmland remains available statewide for diversified agriculture, with 30,000 acres available on O'ahu.

Fourth, Plasch explained that the Wahiawa wastewater treatment plant was in the process of being upgraded to provide North Shore agricultural land with a water source:

> [A] $30 million upgrade to the Plant is under construction, and is slated for completion in October 2012. The decision to upgrade the Plant is the result of a 1998 Consent Decree with the U.S. Environmental Protection Agency ("EPA").
>
> The purpose of the recommendation is to allow farmers to use R-l water from the Wahiawa Reservoir to irrigate any type of crop using any type of irrigation system. The

upgrade to the R-l water-quality standard will open up the mid-level and high-level fields on the North Shore for growing vegetable crops. Under the current R-2 water-quality rating, water from the Reservoir can be used to irrigate orchards and some other crops, but not vegetable and melon crops. As a result, most vegetables and melon crops on the North Shore must be grown at lower elevations where they can be irrigated using groundwater which has no restrictions on use.

In the meantime, landowners and some farmers on the North Shore have reactivated and improved groundwater wells so that more fields can be irrigated with groundwater only. This has allowed some farmers to move some of their operations to the North Shore.

Fifth, Plasch testified that existing agricultural lands could be farmed more intensively:

The large diversified farmers on Oahu generally harvest one, and sometimes two, crops per year from a given field. As a result, land is in crop for about a third of the year, and fallow for about two-thirds of the year.

There are many ways to increase yields, including:
• Farming two or more crops per year.
• For certain crops, going vertical using trellises, cages or sticks to support plants.
• Growing plants using hydroponic farming in greenhouses.

For certain vegetable crops, a number of farmers are already implementing more intensive farming that greatly increases yields, and as a result, greatly reduces land requirements. In particular, many of the tomatoes, cucumbers, peppers, and lettuces sold in our supermarkets are grown hydroponically in greenhouses by Hawaii and mainland farmers.

Plasch also noted that although the capital costs are higher, there are many benefits to hydroponics, including year-round production, higher yields, higher quality produce, fewer pest problems, less energy and water use, and lower transportation costs. Plasch opined that intensive farming practices could increase agricultural production without requiring more land.

Sixth, Plasch testified that 100% self-sufficiency was possible but unlikely in Hawai'i:

> Hawaii has ample farmland to achieve 100% self-sufficiency, with or without Ho'opili and other projects that are consistent with City plans. But as I mentioned above, 100% self-sufficiency in fresh vegetables, melons and fruits is not achievable given competition from low-cost imports, and would not provide food security.
>
> Currently, approximately 15,000 acres of land is farmed statewide to produce approximately 33% of our fresh vegetables, melons and fruits. Therefore, achieving 100% self-sufficiency in these crops would require about 45,000 acres of farmland. That would be 30,000 additional acres statewide. It should be noted that this figure is high, considering the fact that more intensive farming than is currently the case would greatly reduce the amount of land required. The additional land required is small compared to the estimated 177,000 acres ± 5,000 acres of good farmland that is available statewide. In addition, another 70,000+ acres could become available if shipping is interrupted to such an extent that exporting crops becomes unfeasible.
>
> A similar situation would apply to Oahu. About 23,000 additional acres would be required for 100% self-sufficiency in fresh produce (45,000 acres for statewide self-sufficiency x 67% for Oahu's share of the population - the existing 7,300 acres used to grow food crops on Oahu). Again this estimate is high given inter-island shipping and reduced land requirements from intensive farming. As aforementioned, even if all of the farms within the Growth Boundaries relocate to land outside the Growth Boundaries, there would still be 30,000 acres of good farmland available on Oahu outside the Growth Boundaries, plus about 4,700 acres used for export and non-food crops that could come available if needed.

Seventh, as to Hoopili's impact on the current agricultural tenants at the Petition area, Plasch testified that the farms currently operating in the Petition area had all found sufficient lands outside of the urban growth boundary to continue their operations.  In Plasch's professional opinion,

> the Project will have little or no adverse impact on Hawai'i's agricultural production because farmland is available in upper Kunia and the North Shore to accommodate the relocation of existing farms in Ewa.  Also the

> development of the Petition Area and the resulting loss of
> agricultural land will not limit the growth of diversified
> crops since ample agricultural land is available on Oʻahu
> and the other islands.

Plasch's supplemental written direct testimony also opined

> Hoʻopili will have little to no adverse impact on Hawaii's
> agricultural production because ample farmland is available
> on Oahu and the other islands to accommodate the relocation
> of the existing Ewa farms as well as to accommodate the
> future growth of diversified crop farming.  Land is
> available because of the closure or severe contraction of
> all plantations in Hawaiʻi with the single exception of one
> sugar plantation, HC&S on Maui.

Agricultural tenants Aloun Farms and Sugarland Farms also submitted letters in support of the Hoʻopili project.  Alec Sou of Aloun Farms stated that he had already secured "rights to 400 acres of farm land outside of the urban growth boundary with the opportunity to acquire as much as 1,000 acres."  Thus, Sou stated, "We do not view the plans by D.R. Horton as the end of all farming in Honolulu, much less Hawaii. . . .  We believe there is more than sufficient land on Oahu to support our farming operations. . . ."  Larry Jefts of Sugarland Farms stated he was "look[ing] forward to continu[ing] to farm as long as [D.R. Horton-Schuler] would allow [him] to [at Hoʻopili] . . . and [was] willing to move and cooperate with the development plan to the advantage of Horton, to [the farm] and to the entire community, who will benefit from the development, new schools, the rail lines, etc."  Jefts stated that the development "will not hurt [his] business model," as he had "planned for it since

1994," when he initially entered into a lease with the prior owner, the James Campbell Company.

The OP called Russell Kokubun, the Chair of the Board of Agriculture. He testified, "I understand that there will be a loss of some very, very good agricultural lands. But the Department is prepared to make available as much good agricultural land as possible. And that's part of our strategy to expand our agricultural industry in the state." On cross-examination, Kokubun elaborated on the Department's strategy as follows:

> A:    Well, there are a number of agricultural lands that are going to be made available, I think very good agricultural lands.
>
> Q:    Such as?
>
> A:    One of the issues that the Department is working on is there are –- there's a proposed ag park on Kunia Road of 150 acres. There's a parcel again off of Kunia Road, that the DLNR will, is in the process of providing to the Department of Agriculture for agricultural purposes of 400 acres. And we are on the threshold of completing the purchase of the Galbraith Estate or Galbraith Trust Lands.
>
> Q:    Now, with respect to all of those, to your knowledge do they have adequate existing supplies of water to grow the kinds of crops that Aloun Farms is currently growing?
>
> A:    The 150-acre ag park does –- it needs the infrastructure to get the water to the site. But that's something that the Department will do. The 400 acres also has access to Waiahole ditch water. That would also have to be a transmission line provided for that that we would be prepared to do. And the Galbraith Trust Lands have one well, but that's not adequate to irrigate the entire 1700-acre parcel. So we are working on getting some planning and design money to take a look at this.

On cross-examination, Kokubun admitted that the Department did not currently have funds to make water improvements on these

other lands, but that his Department was "working on getting some planning and design money to take a look at" the infrastructure.

Leon Stollenberger, who was admitted as an "expert on the characteristics of agricultural lands in the Central and North Shore areas of [Oʻahu]," testified that the Hoʻopili lands were "one of the most suited to vegetable production literally in the world."

The Sierra Club called Hector Valenzuela, who was admitted without objection as an expert in agriculture, in particular, vegetable crops. He did not support the Petition because of the loss of prime agricultural lands. He testified that the Petition lands were "among the most productive and valuable lands in the state because of their proximity to market and ideal growing conditions," which included higher solar radiation and temperature, lower humidity, and ideal soil conditions resulting in little erosion. These conditions contributed to faster, earlier harvests and higher crop yields. Valenzuela also testified that the state needs "isolated sections of land . . . [to] grow crops competitively," with these isolated sections contributing to the "overall self-sufficiency and sustainability of the state." At Hoʻopili, Aloun Farms had been successful in growing certain crops, providing 40 to 70 percent of the entire production of those crops in the state.

Valenzuela believed that "some of the crops that are grown in Ho'opili . . . may be very difficult to grow . . . competitively in other parts of the state." He disagreed that hydroponics could replace the need for prime agricultural land on O'ahu. According to Valenzuela, hydroponics is capital-intensive; he criticized D.R. Horton-Schuler's lack of documentation supporting the idea that greenhouses or other hi-tech farming methods were "feasible and/or profitable in the proposed Ho'opili development area."

The Sierra Club also called farmer Gary Maunakea-Forth, who testified that finding available farmland for long-term lease was difficult, and it was costly to prepare land for farming.

The Sierra Club also submitted into evidence an undated scholarly article entitled "Agriculture" by C.N. Lee and H.C. "Skip" Bittenbender that opined that "near self-sufficiency [in Hawai'i] would require an estimated 260,800 acres . . . to meet projected resident needs in 2007. . . ."

Hee called former Governor John Waihee, who testified that he was concerned that the replacement agricultural lands did not have the same water supply that Ho'opili enjoyed. Hee himself testified that there may be available agricultural land, but it is not prime agricultural land, and would require water to grow crops productively and profitably. He also testified that the

state was "beyond the tipping point of food security."  Both Waihee and Hee believed that the Hoʻopili development was not reasonably necessary for urban growth, as tens of thousands of homes were already approved and permitted for the region, and because the Petition lands were among the most agriculturally productive in the state.

> ### b.    Evidence and Testimony on the Need for the Project

D.R. Horton-Schuler called Ann Bouslog, who was admitted as an "expert in the field of market analysis and economics."  D.R. Horton also submitted her written direct testimony and supplemental written direct testimony.  Bouslog testified to the need for urban growth at the Petition area.  Bouslog's supplemental written direct testimony stated that, by 2030, there would be a 29,000-unit housing deficit if there were no further residential entitlements.  In her supplemental written direct testimony, Bouslog opined that "Hoʻopili's 11,750 units, if entitled, would make a significant contribution towards addressing this unmet need."  According to Bouslog, Hoʻopili is "ideally situated" to help meet Oahu's housing needs, as it is "[l]ocated near the emerging Second City of Kapolei and along the major transportation corridor between Kapolei and the existing urbanized areas of Oʻahu."  Further, "the compact development style and primary resident-orientation of the

16

Project suggest that it would appeal to a broad range of potential future buyers and renters, including substantial shares of affordable and workforce housing."  Bouslog estimated that "the overall average absorption at Hoʻopili" would be "650 unit sales per year," with projected average sales of 725 units per year in the first ten-year phase of development, and projected "average sales of about 595 units per year" in the second ten-year phase of development.

The DPP called Robert Stanfield, chief of the Development Plans and Zone Change Branch of the DPP.  He testified that the "DPP supports the Petition to reclassify the land from Agricultural District to the Urban District," because "the Petition is consistent with all relevant city plans."  He testified that "an average of 1800 units a year will be needed in Central Oahu and Ewa to successfully divert growth away from the country areas and Windward Oahu and the East Honolulu Sustainable Community areas."  Stanfield also testified that the City estimated that about 34,000 units in the ʻEwa region were slated for construction as of July 2010.

Bouslog believed that the DPP's estimate of the number of homes coming online was too high, because it included units intended to be developed as second homes, timeshares, or resort units.  She estimated that 24,000 potential primary housing

units were planned for the 'Ewa region, which still fell far below the number needed to meet Ewa's housing needs.

In her supplemental written direct testimony, Bouslog stated that the following negative impacts would occur without development of the Ho'opili project:

> 1. Island's population and economic growth would likely be constrained. In the medium- and long-term, this would raise significant concerns:
> a) Displacement of development activity away from the planned Kapolei region and back into other areas of Oahu or the neighbor islands – areas less suited to accommodate significant growth;
> b) Worsening shortage of primary housing on Oahu;
> c) Accelerated price pressures on housing, especially Ewa and Kapolei;
> d) Higher prices associated with commercial and industrial properties - possibly good for landlords, but a burden for tenants and consumers; and
> e) A less efficient and cost effective transit system, if built.
> 2. Significant loss of potential jobs creation in East Kapolei area, along with the economic and fiscal impacts those would support.

### c.    Evidence and Testimony on the Project's Consistency with the Hawai'i State Plan

D.R. Horton-Schuler called Vincent Shigekuni who was admitted without objection as an "expert in the field of planning." He testified that the Ho'opili project was consistent with the Hawai'i State Plan.

The OP called planning program administrator, Mary Lou Kobayashi. She testified that the "proposed reclassification generally conforms to the overall theme, goals, objectives and policies and priority guidelines of the Hawai'i State Plan, particularly those relating to housing, the economy and

sustainability."  Specifically, she testified that "the reclassification supports Hawai'i State Plan policies to provide increased job opportunities, to effectively provide housing opportunities and address sustainability through energy and water conservation measure."

When cross-examined as to whether the Petition was inconsistent with the Hawai'i State Plan's agricultural objectives, Kobayashi answered, "No. . . [W]ith the fact that there are additional lands available for agricultural use . . . the reclassification would not necessarily adversely affect or impact the . . . various agricultural objectives."  This was because "there are other lands that are available within the Agricultural District for agricultural activities such that the State Plan policies with regard to agriculture as a whole are still being supported."

### d.     Evidence and Testimony on Important Agricultural Lands

D.R. Horton-Schuler's expert in the field of planning, Shigekuni, testified that the "Petition Area is not designated as Important Agricultural Land."

DPP's chief planning division head, Kathy Sokugawa, also testified that DPP "would not be recommending [the Ho'opili] area as a potential IAL area."  Sokugawa also explained that the City and County process for identifying IALs was supposed to start

when the state gave funding to the counties for that purpose. Sokugawa testified that the state had not yet funded the counties, but that the City and County of Honolulu had set aside its own funds to begin the IAL designation process.

On March 7, 2012, while the LUC was in the midst of evidentiary hearings on the Petition, counsel for Hee, Eric Seitz, wrote a letter to DPP's counsel, Don Kitaoka, drawing his attention to the Honolulu City Council's Resolution 12-23, which he claimed "intended to expedite the classification of Important Agricultural Lands . . . including those agriculturally productive lands within the urban growth boundary classified as prime agricultural lands." Seitz contended that the Resolution "may have a critical impact" on the pending Ho'opili proceedings; therefore, he asked that DPP "produce witnesses who will be able to testify as to the possible effects of the Resolution on testimony and opinions previously offered by individuals and officials whose support for the project[] was based upon the premise that the lands at issue could not and would not be classified as Important Agricultural Lands."

Seitz enclosed Resolution 12-23 with the letter. The Resolution is entitled, "Urging the City's Agricultural Liaison to Expedite the Identifying and Mapping of Important Agricultural Lands and Ensure that the City Works to Preserve the Availability of Agricultural Lands for Farming." The

Resolution notes that "the City Administration has begun the process of identification and mapping of IALs[.]"  The Resolution directed Laura Thielen, the then newly appointed city Agricultural Liaison, to expedite the identification and mapping of IALs and to report back to the City Council on the progress of the City's efforts.  The Resolution also stated that "agriculturally productive lands within urban growth boundaries that are classified as prime agricultural lands, provided adequate water supply is available" be "consider[ed]" in the IAL identification process.

A week later, Kitaoka wrote a letter to the LUC alerting them to Seitz's letter.  Kitaoka represented to the LUC that the DPP's position was "that production of any additional witnesses regarding this matter for the aforementioned dockets [i.e., Koa Ridge and Hoʻopili] is unnecessary," but that additional witnesses would be provided if the LUC thought it was necessary.  Further, Kitaoka noted that the City Council expressly did not intend for Resolution 12-23 to "influence the state Land Use Commission decision making process on any case pending before the Commission," referring to Koa Ridge and Hoʻopili.  Indeed, the City Council's Committee on Zoning and Planning's Report on Resolution 12-23, attached to Kitaoka's letter, states, "[I]t is your committee's intent that the City work within the parameters set forth by state law [in identifying IALs] and not influence

the state Land Use Commission decision-making process on any case pending before the Commission."

After Resolution 12-23 entered the record, DPP re-called chief planning division head Sokugawa.  When asked on direct examination whether the resolution "would impact or affect prior testimony or positions taken by [the DPP] in support of the pending Petition," Sokugawa answered in the negative.  Sokugawa explained that the city's development plans "designate [the Hoʻopili parcel] for urban development, not agriculture." Sokugawa also highlighted "the last section of the committee report [on Resolution 12-23, which] . . . states [that it] ʻis not intended to influence the State Land Use Commission decision-making process on any case pending before the Commission.ʼ"  When the OP asked about the process of recommending IALs, Sokugawa explained that DPP was about to hire a consultant to help with the IAL designation process, and that when DPP has completed its IAL recommendations, the recommendations will go to the City Council, then on to the Land Use Commission.  One of the LUC Commissioners, Commissioner Heller, also asked Sokugawa to provide a timeframe for the completion of the IAL identification process.  Sokugawa testified that the process would begin later in 2012, and that her "optimistic guess would be that there'd be something before the City Council in a year."

### 4.  The LUC's D&O

The LUC reclassified the Petition lands from the state agricultural land use district to the state urban land use district, subject to conditions that are not relevant on appeal. The LUC's D&O was 186 pages long and contained 666 findings of fact ("FOFs," or "FOF" in the singular), 32 conclusions of law ("COLs," or "COL" in the singular), and 26 conditions.  Relevant to this appeal, the LUC rendered 8 FOFs concerning the need for the proposed project; 22 FOFs concerning the proposed project's impact on agricultural resources in the area; 11 FOFs finding that the Petition area would not be designated as IAL; and 39 FOFs addressing the proposed project's consistency with the Hawaiʻi State Plan.  That left nearly 600 other FOFs detailing procedural matters; economic impacts; social impacts; impacts on flora, fauna, arthropods, archaeological and historical resources, cultural resources, groundwater resources, and scenic resources; environmental quality; public services and facilities such as highway and roadway facilities, parks and recreational facilities, water service, wastewater disposal, drainage, solid waste disposal, schools, police and fire protection, emergency/medical services, and electricity and telephone services; and conformance to other state and county plans such as the Hawaiʻi State Functional Plan, the General Plan for the City and County of Honolulu, and the ʻEwa Development Plan, as

23

well as the Coastal Zone Management Program.  Clearly, these

latter findings are not relevant on appeal.

**B. Circuit Court Appeal**

Appellants appealed the LUC's D&O to the circuit court,

alleging that the LUC violated Article XI, Section 3 of the

Hawaiʻi State Constitution (Count 1), violated Act 183 (Count 2),

and violated HAR § 15-15-77 (Count 3).  In their opening brief,

they did not identify any particular FOFs as clearly erroneous

or any COLs as wrong.  At oral argument, the circuit court asked

the Appellants which particular FOFs they believed were in

error.  Initially their response was "all of them"; however,

with further probing by the court Appellants clarified that they

challenged FOFs 428, 430-434, 437, 444-448, 567-568, 571-572,

and 574, which are discussed in greater detail <u>infra</u>, Section

IV.C.  The circuit court then asked Appellants which subsections

of HRS § 91-14(g) (2012)[3] applied to their agency appeal, as

---

[3]   HRS § 91-14(g) provides the following standards:

> (g) Upon review of the record the court may affirm the
> decision of the agency or remand the case with instructions
> for further proceedings; or it may reverse or modify the
> decision and order if the substantial rights of the
> petitioners may have been prejudiced because the
> administrative findings, conclusions, decisions, or orders
> are:
>> (1) In violation of constitutional or statutory
>> provisions; or
>> (2) In excess of the statutory authority or
>> jurisdiction of the agency; or
>> (3) Made upon unlawful procedure; or
>> (4) Affected by other error of law; or

(continued. . .)

their Opening Brief did not specifically include that information.  Appellants' response was all six subsections applied; however, through further questioning, they clarified that subsection 3 (unlawful procedure)[4] and 4 (other error of law) did not apply.  The Appellants focused on subsection 1, arguing that the LUC's reclassification was "[i]n violation of constitutional or statutory provisions," specifically Article XI, Section 3, HRS chapter 205, and HAR § 15-15-77.  When the circuit court asked for argument on subsection 5, in other words, whether the LUC's D&O was "[c]learly erroneous in view of the reliable, probative, and substantial evidence on the whole record," the Appellants did not point to a specific place in the record, besides their opening brief, where they challenged the evidence adduced before the LUC.

After hearing argument from all the parties, the circuit court dismissed the appeal and affirmed the LUC's D&O.  The Appellants timely appealed, and this court accepted transfer of their case.

---

(. . .continued)

        (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
        (6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

[4]     At oral argument, counsel for Appellants represented, "We made it clear [to the circuit court] that we were appealing the [LUC's] process. . . ." http://www.courts.state.hi.us/courts/oral_arguments/archive/oasc13_2266.htm at 15:09-13.  The record reveals, however, that Appellants abandoned any challenge to the LUC's D&O based on unlawful procedure.

## III. Standard of Review

> Review of a decision made by the circuit court upon its review of an agency's decision is a secondary appeal.  The standard of review is one in which this court must determine whether the circuit court was right or wrong in its decision, applying the standards set forth in HRS § 91-14(g) . . . to the agency's decision.

Dep't of Env. Servs. v. Land Use Comm'n, 127 Hawai'i 5, 12, 275 P.3d 809, 816 (2012)(citation omitted).  An agency's conclusions of law are reviewed de novo, while an agency's factual findings are reviewed for clear error.  Camara v. Agsalud, 67 Haw. 212, 216, 685 P.2d 794, 797 (1984).

> In order to preserve the function of administrative agencies in discharging their delegated duties and the function of this court in reviewing agency determinations, a presumption of validity is accorded to decisions of administrative bodies acting within their sphere of expertise and one seeking to upset the order bears "the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences."

In re Hawaii Elec. Light Co., 60 Haw. 625, 630, 594 P.2d 612, 617 (1979) (citations omitted).

## IV.  Discussion

### A.    Article XI, Section 3 Does Not Require the LUC to Stay Reclassification Proceedings Pending the Completion of the County IAL Designation Process

Appellants argue that that the LUC should be required to stay reclassification of the potentially important agricultural land at issue pending formal designation of IALs by the counties, pursuant to the intent behind Article XI, Section 3 of the Hawai'i Constitution.  Constitutional intent is to be found

in the language of the constitutional provision itself.  See

Malahoff v. Saito, 111 Hawai'i 168, 181, 140 P.3d 401, 414 (2006)

("[T]he fundamental principle in interpreting a constitutional

provision is to give effect to [the] intent [of the framers and

the people adopting it].  This intent is to be found in the

instrument itself.").  The plain language of Article XI, Section

3 does not require the LUC to stay reclassification proceedings

until the IAL mapping process is complete.  Again, Article XI,

Section 3 provides the following:

> The State shall conserve and protect agricultural lands,
> promote diversified agriculture, increase agricultural
> self-sufficiency and assure the availability of
> agriculturally suitable lands. The legislature shall
> provide standards and criteria to accomplish the foregoing.
>
> Lands identified by the State as important agricultural
> lands needed to fulfill the purposes above shall not be
> reclassified by the State or rezoned by its political
> subdivisions without meeting the standards and criteria
> established by the legislature and approved by a two-thirds
> vote of the body responsible for the reclassification or
> rezoning action.

The provision requires only that any "[l]ands identified by the

State as important agricultural lands . . . shall not be

reclassified by the State . . . without meeting the standards

and criteria established by the legislature and approved by a

two-thirds vote of the body responsible for the reclassification

. . . action."

To the extent the Appellants argue that this constitutional

provision alone required the LUC to suspend reclassification

proceedings pending formal identification of IALs in order to

27

"conserve and protect" agricultural land, that argument has been foreclosed by Save Sunset Beach, 102 Hawaiʻi 465, 78 P.3d 1. In that case, this court held that Article XI, Section 3, standing alone, is "not self-executing, . . . has no effect and does not act as a barrier to reclassification." 102 Hawaiʻi at 476, 78 P.3d at 12. This court explained that a non-self-executing constitutional provision is one that "merely indicates principles, without laying down rules by means of which those principles may be given the force of law." 102 Hawaiʻi at 475, 78 P.3d at 11. Article XI, Section 3 by itself "merely indicates principles" of agricultural conservation and protection, and those principles do not have the force of law absent the legislature's provision of "standards and criteria to accomplish" agricultural conservation and protection. The legislature did not provide the necessary "implementing legislation" until 2005, upon the enactment of Act 183, which is described in greater detail in the next section.

The Appellants also analogize their case to Ka Paʻakai O KaʻAina v. Land Use Comm'n, 94 Hawaiʻi 31, 7 P.3d 1068 (2000). That case held that Article XII, Section 7 required the LUC to make specific findings of fact and conclusions of law regarding the protection of customary and traditional native Hawaiian rights when reclassifying land. 94 Hawaiʻi at 47, 7 P.3d at

28

1084. Article XII, Section 7 provides, "The State reaffirms and shall protect all rights, customarily and traditionally exercised for subsistence, cultural and religious purposes and possessed by ahupua'a tenants who are descendants of native Hawaiians who inhabited the Hawaiian Islands prior to 1778, subject to the right of the State to regulate such rights."  The language of Article XII, Section 7 expressly places an affirmative duty upon state agencies, unlike the language of Article XI, Section 3, which contains a mandate to conserve and protect agriculture and agricultural lands, pursuant to "standards and criteria" that the legislature shall provide. Due to differences in the language of the constitutional provisions, Ka Pa'akai O Ka'Aina does not support the argument that Article XI, Section 3 places a free-standing affirmative duty upon the LUC to conserve and protect the agricultural land at issue in this case by staying reclassification until the county IAL designation process has been completed.  Rather, Article XI, Section 3's mandate is implemented with reference to the legislature's "standards and criteria," which were enacted via Act 183, which is discussed in greater detail in the next section of this opinion.

As Article XI, Section 3 is not self-executing, and as the plain language of Article XI, Section 3 expresses no intent to require the LUC to stay reclassification proceedings pending the

formal identification of IALs, it is not appropriate to resort to constitutional history to divine such intent.  See Malahoff, 111 Hawaiʻi at 181, 140 P.3d at 414 ("When the text of a constitutional provision is not ambiguous, the court, in construing it, is not at liberty to search for its meaning beyond the instrument.").  In any event, the constitutional history is silent on the issue of whether IALs must first be formally identified before the LUC can reclassify land.  While a few delegates expressed strong concerns that the LUC had allowed reclassification and urbanization of vast tracts of agricultural land, no delegate suggested that the LUC should be required to stay reclassification of land pending formal IAL designation. See Committee of the Whole Report No. 18 in 1 Proceedings of the Constitutional Convention of 1978, at 439-43.  Contrary to the Appellants' assertion, this constitutional history does not demonstrate that Article XI, Section 3 expresses such a "substantive mandate."

B.   **Act 183 Does Not Require the LUC to Stay Reclassification Proceedings Pending the Completion of the County IAL Designation Process**

Save Sunset Beach held that Article XI, Section 3 was not self-executing.  102 Hawaiʻi at 476, 78 P.3d at 12.  As such, Article XI, Section 3 required implementing legislation to effectuate its purpose of agricultural conservation and protection.  The enactment of Act 183 of the 2005 Legislative

Session finally set forth the "standards and criteria" through which the constitutional mandate would be fulfilled.  The plain language of Act 183 does not require the LUC to identify IALs before reclassifying land.  See Silva v. City and Cnty. of Honolulu, 115 Hawai'i 1, 6, 165 P.3d 247, 252 (2007) ("When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself.")

Act 183 set forth the procedures by which IALs are identified.  There are two ways.  Under the first method, a "farmer or landowner with lands qualifying under section 205-44 may file with the [LUC] a petition for declaratory order to designate the lands as important agricultural lands."  HRS § 205-45(a) (Supp. 2005).  It is undisputed in this case that D.R. Horton-Schuler does not desire to designate the Petition lands as IAL.  Rather, the dispute in this case centers upon the second method by which IALs are identified, i.e., the method initiated by the counties and culminating in the LUC's formal identification of IALs statewide.

Under the second method, "[e]ach county shall identify and map potential important agricultural lands within its jurisdiction based on the standards and criteria in section 205-44 and the intent of this part, except lands that have been

designated, through the state land use, zoning, or county planning process, for urban use by the State or county."  HRS § 205-47(a) (Supp. 2005).  The counties must then submit "important agricultural lands maps . . . to the county council for decision-making."  HRS § 205-47(e) (Supp. 2005).  The county councils "shall adopt the maps, with or without changes, by resolution," then transmit the maps "to the land use commission for further action pursuant to section 205-48."  Id.  HRS § 205-48 (Supp. 2005), in turn, states, "The land use commission shall receive the county recommendations and maps" recommending lands as IAL.  Under HRS § 205-49(a) (Supp. 2005), the LUC "shall then proceed to identify and designate important agricultural lands. . . ."  To date, although Kauaʻi and the City & County of Honolulu are currently in the process of identifying proposed IALs, the counties have not submitted to the county councils or the LUC their IAL recommendations.  See http://mapoahuagland.com/about/faq ("At this time, only Oʻahu and Kauaʻi Counties are conducting the *Mandatory County Designation* process.")[5] (last visited Dec. 15, 2015).

Act 183 also amended HRS § 205-4, which sets forth the general procedures for reclassifying land, but only to add that

---

[5]     Pursuant to Hawaiʻi Rules of Evidence Rule 201(b)(2), this court takes judicial notice of the information on DPP's website, mapoahuagland.com, which was created to publically disseminate information about the county's IAL identification process.

"lands designated or sought to be designated as important agricultural lands," like conservation lands and any lands of greater than 15 acres, are to be reclassified by the LUC. 2005 Haw. Sess. Laws Act 183, § 4 at 588-89. Had the legislature intended to suspend reclassification of land until IALs are identified, it could have further amended HRS § 205-4 to so state. Nothing in the plain language of Act 183, however, indicates an intent to have IALs designated first before reclassification of land may proceed.

Act 183 sets forth methods for identifying IALs, and Article XI, Section 3 then mandates heightened protection of IALs so identified. Act 183 is not ambiguous, and there is no express requirement within it prohibiting the LUC from reclassifying land pending formal identification of IALs. As such, there is no need to resort to legislative history to divine such intent. See Silva, 115 Hawaiʻi at 6, 165 P.3d at 252 (holding that "the courts may resort to . . . the use of legislative history as an interpretive tool" in "construing an ambiguous statute. . . .").

Even if this court were to resort to legislative history, an examination of that history reveals silence on the issue of whether the LUC must stay reclassification proceedings until IALs are formally identified. There is no suggestion in committee reports or floor speeches of such an intent. See 2005

Haw. Sess. Laws Act 183, pp. 580-93; H. Stand. Comm. Rep. No. 194, in 2005 House Journal, at 1127; H. Stand. Comm. Rep. No. 531, in 2005 House Journal, at 1245; 2005 House Journal, at 298 (floor speech); H. Stand. Comm. Rep. No. 968, in 2005 House Journal, at 1411-12; 2005 House Journal, at 993-99 (floor speeches); S. Stand. Comm. Rep. No. 1281, in 2005 Senate Journal, at 1639-41; S. Stand. Comm. Rep. No. 1592, in 2005 Senate Journal, at 1775-77; Conf. Comm. Rep. No. 175, in 2005 House Journal, at 1818-19, 2005 Senate Journal, at 1080-81.

Appellants also assert that the LUC must adopt rules and regulations regarding designation of Important Agricultural Lands.  The LUC did, however, recently adopt the following rules and regulations regarding county designation of IALs, thus mooting the Appellants' argument:  HAR §§ 15-15-125 (effective 2013) ("County identification of important agricultural lands") and -126 (effective 2013) ("Criteria for designation of lands as important agricultural lands pursuant to county recommendation").  To the extent that the Appellants argue that there should be rules and regulations allowing the LUC to designate IALs independently of the processes described in HRS §§ 205-47 through -49, such argument is not supported by the plain language of those statutes.

Lastly, one crucial fact severely undermines the Appellants' argument that the LUC should stay reclassification

of the Petition lands in this case because they would likely qualify as IALs. HRS § 205-47(a) exempts from IAL designation "lands that have been designated, through the . . . county planning process, for urban use by the State or county." The Petition area is located within the Urban Growth Boundary of the ʻEwa Development Plan. The Petition lands have, therefore, been designated through the county planning processes for urban use and are, as a result, disqualified as IAL. Although the Appellants argue that the land could be taken out of the Urban Growth Boundary upon the revision of the ʻEwa Development Plan, this court takes judicial notice of the recently amended ʻEwa Development Plan, which continues to include Hoʻopili within the Urban Growth Boundary. Further, at the hearing before the LUC, DPP also expressly testified that it would exclude the Petition land from its IAL recommendations. Even after the City Council's Resolution 12-23 became part of the record, DPP's witness testified that DPP's plan to exclude the Petition land as IAL would not change. In fact, the DPP <u>has</u> excluded the Petition lands from its current IAL recommendation. <u>See</u> <u>http://mapoahuagland.com/about/faq/</u> ("Can lands reserved for [the] Hoʻopili . . . development[] be designated as IAL? No, [this] project[ is] excluded from consideration as IAL because [it has] long been included in County land use plans for urban

35

use.  State law does not allow land identified for urban use by the State or county to be designated as IAL.") (last visited Dec. 15, 2015).  In short, even if the LUC were to stay the instant reclassification proceedings to allow the county-initiated IAL designation process to run its course, it would make no difference for the particular lands at issue in this case.

C.    **Reliable, Probative, and Substantial Evidence Supported the LUC's Findings That the Reclassification Complied with HAR § 15-15-77**

The Appellants argue before this court that the circuit court erred in upholding the LUC's decision and order, because the LUC "simply ignor[ed]" "overwhelming and dispositive evidence" that alternative agricultural lands were insufficient, that agriculture on Oʻahu would not be harmed by the reclassification, and that the Hoʻopili lands are needed for urban growth, all in violation of HAR § 15-15-77.

Preliminarily, we note that, despite pinpointing specific challenged FOFs at oral argument before the circuit court, the Appellants' Opening Brief once again pursues a global attack on the LUC's D&O.  The Opening Brief before this court, like the opening brief before the circuit court, fails to identify which FOFs the Appellants view as clearly erroneous.  As such, this court is bound by all of the LUC's unchallenged FOFs.  See Bremer v. Weeks, 104 Hawaiʻi 43, 63, 85 P.3d 150, 170 (2004)

(holding that "findings of fact . . . that are not challenged on appeal are binding on the appellate court") (citations omitted). We remind counsel that Hawaiʻi Rules of Appellate Procedure ("HRAP") Rule 28(b)(4)(C) (2010) requires that an appellant's opening brief concisely state points of error, and, "when the point involves a finding or conclusion of the . . . agency, either a quotation of the finding or conclusion urged as error or reference to appended findings and conclusions. . . ." This court has looked past violations of HRAP Rule 28(b)(4) to reach the merits of a case where issues of great importance are at stake. See, e.g., Morgan v. Planning Dep't, 104 Hawaiʻi 173, 181, 86 P.3d 982, 990 (2004) ("[B]ecause the issues raised in the instant case are of great importance [i.e., the Hawaiʻi constitution's recognition of the significance of conserving and protecting Hawaii's natural beauty and natural resources], we address the merits of the issues raised . . . notwithstanding the [Appellants'] technical violation of HRAP Rule 28(b)(4).") In this case, we note that the Appellants did specifically challenge FOFs 428, 430-434, 437, 444-448,[6] 567-568, 571-572, and

---

[6]    FOFs 444-448 concern whether there is enough groundwater for the Hoʻopili development. These findings, however, are only tangentially related to the HAR § 15-15-77 issue. The Appellants brought up groundwater only to argue that "[r]emoving land from agricultural production will have grave impacts for this island, including potentially substantial impacts to the groundwater." Whether or not the future Hoʻopili residents will have enough groundwater, however, is an issue unconnected to whether the reclassification (1) will not impair agricultural production or (2) is necessary for urban

(continued. . .)

574 before the circuit court, and due to the public importance of this case, we will consider the Appellants' appeal as continuing to challenge these particular FOFs. Even given this latitude, however, the Appellants fail to carry their burden of showing why the LUC's D&O should not be affirmed.

### 1.  HAR § 15-15-77(b)(6)

HAR § 15-15-77(b)(6) provides the following:

> Lands in intensive agricultural use for two years prior to date of filing of a petition or lands with a high capacity for intensive agricultural use shall not be taken out of the agricultural district unless the commission finds either that the action:
> (A) Will not substantially impair actual or potential agricultural production in the vicinity of the subject property or in the county or State; or
> (B) Is reasonably necessary for urban growth.

(Emphasis added). This regulation is stated in the disjunctive. Therefore, if the LUC's reclassification satisfies one prong, the reclassification will be upheld.

### a.  Reasonable Necessity of Urban Growth

The LUC's FOFs concerning the necessity of urban growth were numbered 356-363. Even giving Appellants the latitude of considering the particular FOFs challenged before the circuit court, the fact remains that the Appellants did not challenge these findings, and they are binding upon this court. Bremer, 104 Hawai'i at 63, 85 P.3d at 170. As such, this court must

---

(. . .continued)
growth. In other words, the groundwater issue is separate from Appellants' point of error concerning HAR § 15-15-77, and is therefore not further discussed in this opinion.

accept that the reclassification was necessary for urban growth. Further, that singular finding under HAR § 15-15-77(b)(6) justifies the LUC's reclassification, as HAR § 15-15-77(b)(6) is stated in the disjunctive.

### b.    No Substantial Impairment of Agricultural Production

As this court is procedurally bound by the LUC's determination that the reclassification was reasonably necessary for urban growth due to Appellants' failure to challenge that determination, there is no need to examine Appellants' challenge to the LUC's FOFs as to whether the reclassification will impair agricultural production. However, once again giving latitude due to the public importance of this case, we note that the Appellants did challenge the following FOFs on this issue:

> 428. The DOA, [sic] is working to make good agricultural land available as part of its strategy to expand our agricultural industry in the State, including land for the possible relocation of the tenants of the Petition Area. Such lands include the proposed 150-acre agricultural park on Kunia Road, a 400-acre parcel off of Kunia Road held by the DLNR, and the 1,700-acre Galbraith Trust Lands currently in the process of being purchased by the DOA. The DOA is working to provide the infrastructure necessary to provide water to these lands.
>
> . . . .
>
> 430. An increasing number of farmers in Hawaii are implementing intensive farming methods, such as farming two or more crops per year; using trellises, cages or sticks to support plants; and growing plants using hydroponic farming in greenhouses, which have resulted in increasing production without requiring more land. In particular, many of the tomatoes, cucumbers, peppers, and lettuces sold in our supermarkets are grown hydroponically in greenhouses by Hawaii and mainland farmers.

39

431. There are disputing [sic] opinions as to whether good farm lands are or are not necessary because of hydroponics. According to some experts, hydroponics is highly capital intensive and its feasibility and profitability is unproven in Hawaiʻi.

432. Estimates of the amount of acreage needed to increase food self-sufficiency vary widely. The Petitioner estimates that approximately an additional 23,000 acres on Oʻahu would be required for 100% self-sufficiency in fresh produce. Faculty researchers from the University of Hawaiʻi calculated that "near self-sufficiency" for a range of vegetables, grains, fruits, other crops, meat, and dairy would require an estimated 260,800 acres statewide.

433. Currently, approximately 15,000 acres of land is farmed statewide to produce approximately 33% of the State's fresh vegetables, melons and fruits. Therefore, achieving 100% self-sufficiency in these crops would require about 30,000 additional acres of farmland statewide. The additional land required is small compared to the estimated 177,000 acres ± 5,000 acres of good farmland that is available statewide. In addition, another 70,000+ acres could become available if shipping is interrupted to such an extent that exporting crops becomes unfeasible.

434. For the Island of Oʻahu, approximately 23,000 additional acres would be required for 100% self-sufficiency in fresh produce. This estimate is high, given inter-island shipping and reduced land requirements from intensive farming.

. . . .

437. The Project will have little or no adverse impact on Hawaiʻi's agricultural production, as other farmland is available on the island of Oʻahu to accommodate the relocation of the existing ʻEwa farms, as well as to accommodate the future growth of diversified crop farming. Land is available because of the contraction of statewide agriculture.

The Appellants' Opening Brief contains no argument or record citations referencing (1) how much land is necessary for 100% self-sufficiency; or (2) intensive farming methods, particularly hydroponics; therefore, "[p]oints not argued may be deemed waived." HRAP Rule 28(b)(7) (2010). Thus, Appellants have

waived review of FOFs 430-434.  Therefore, the only remaining FOFs not waived on the agricultural impact issue are FOFs 428 and 437.

As to FOF 428, the Appellants argue that Director Kokubun himself testified that the State does not yet have the funds to invest in water infrastructure improvement.  The Appellants' point is consistent with the FOF, which states that the State is "working to provide the infrastructure necessary to provide water to these lands."  Kokubun's testimony (that the Department of Agriculture was "working on getting some planning and design money to take a look at" the infrastructure needs of the available agricultural land) supports this FOF.  Consequently, this FOF is not clearly erroneous.

Turning to FOF 437, it is clear that this fact is the one the Appellants primarily challenge.  They disagree with the premise that there is enough available agricultural land on Oʻahu to relocate the Hoʻopili tenants and accommodate the future growth of diversified farming.  The Appellants contend that the LUC "simply ignor[ed]" their evidence that it was hard for farmers to find available agricultural land; to secure long-term leases on agricultural land; and to economically prepare land for farming, particularly where water infrastructure must be developed or improved.  Additionally, Appellants argue that

41

there was no "record of productivity" on replacement agricultural lands.

The LUC represented in its Answering Brief, however, that it did not "simply ignore" testimony that "lands had been in cultivation, but considered the specific replacement lands as well as other evidence concerning agriculture in Hawaii in general."  Indeed, the LUC considered testimony from Plasch that "the Project will have little or no adverse impact on Hawaiʻi's agricultural production because farmland is available in upper Kunia and the North Shore to accommodate the relocation of existing farms in ʻEwa."  Plasch also testified that "the development of the Petition Area and the resulting loss of agricultural land will not limit the growth of diversified crops since ample agricultural land is available on Oʻahu and the other islands."  Plasch explained that 263,000 acres of farmland have been released statewide from 1968 to 2009 due to the contraction of plantation agriculture, with about 177,000 ± 5,000 acres of good farmland now available for diversified agriculture.  On Oʻahu alone, Plasch testified, there are 30,000 acres of high quality farmland available for diversified agriculture.  He further testified that the farms on Hoʻopili have sufficient lands outside of the urban growth boundary to continue their operations.

For their part, Hoʻopili tenants Aloun Farms and Sugarland Farms attested to the suitability of the replacement lands. Director Kokubun also testified as to the thousands of acres in Kunia and Wahiawa that the Department of Agriculture was going to make available for agricultural production, with plans to improve water infrastructure. In summary, Plasch, Kokubun, Sou, and Jefts provided reliable, probative, and substantial evidence supporting the LUC's FOF 437. Substantial evidence is "credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." In Re Water Use Permit Applications, 94 Hawaiʻi 97, 119, 9 P.3d 409, 431 (2000) (citations omitted). We are, therefore, bound by this finding. A court reviewing an agency's decision cannot "consider the weight of the evidence to ascertain whether it weighs in favor of the administrative findings, or . . . review the agency's findings of fact by passing upon the credibility of witnesses or conflicts in testimony, especially the finding of an expert agency in dealing with a specialized field." Application of Hawaiian Elec. Co., Inc., 81 Hawaiʻi 459, 465, 918 P.2d 561, 567 (1996) (citation omitted).

Appellants have not shown how finding of fact number 437 was clearly erroneous. In short, the Appellants have not met their burden of proving that the LUC's finding that the

reclassification would not impair agricultural production was clearly erroneous.

### 2.   HAR § 15-15-77(a)

HAR § 15-15-77(a) requires reclassifications to conform to the Hawai'i State Plan.  Although the Appellants challenged five FOFs (at oral argument before the circuit court) regarding the project's conformance with the Hawai'i State Plan, Appellants' Opening Brief contains no supporting argument.  The Opening Brief states only, "The Hawaii State Plan provides that the state shall 'assure the availability of agriculturally suitable lands with adequate water to accommodate present and future needs.  HRS § 226-7."  Under HRAP Rule 28(b)(7), then, the argument that the LUC's reclassification violated HAR § 15-15-77(a) is waived.

### D.   The LUC's Conclusions of Law

We note that HRS § 205-4(h) (Supp. 2005) requires the LUC to approve a proposed boundary amendment only after concluding, by a preponderance of the evidence, that it is "reasonable, not violative of section 205-2 and part III of this chapter, and consistent with the policies and criteria established pursuant to sections 205-16 and 205-17."  (Emphasis added).  HAR § 15-15-77 further requires that any approved boundary amendment be consistent with HRS § 205A-2 (Hawaii's Coastal Zone Management Program).  In this case, in COL 12, the LUC concluded that the

44

reclassification "is reasonable, not violative of HRS § 205-2, and is consistent with the policies and criteria established pursuant to HRS §§ 205-16, 205-17, and 205A-2," omitting any conclusion regarding part III of HRS Chapter 205.  The Appellants did not challenge COL 12, but this court may freely review the LUC's COLs.  Ka Pa'akai O Ka'Aina, 94 Hawai'i at 41, 7 P.3d at 1078.   We note that the LUC did render the following COL 7:

> The Commission, notwithstanding the agricultural use or agricultural classification of the Petition Area, has authority to entertain this Petition and render a decision thereon without consideration of the standards and criteria for the reclassification or rezoning of IAL set forth in HRS § 205-50, because the Petition Area is not currently designated as IAL under Act 183 (2005) and HRS Chapter 205.

This COL, however, merely states that the reclassification of the Petition lands was not being made pursuant to HRS § 205-50, which governs reclassification of IALs only.  This statement is true, in that the instant reclassification was made pursuant to HRS § 205-4, which governs all land reclassifications.  This COL, however, does not fulfill the requirement under HRS § 205-4(h) that the LUC conclude, by a preponderance of the evidence, that the reclassification did not violate part III of Chapter 205.  Hence, the LUC erred in failing to conclude, by a preponderance of the evidence, that the reclassification was not violative of part III of Chapter 205.

Under the circumstances of this case, however, this error is harmless because the LUC made separate findings on Important Agricultural Lands that would have supported a conclusion that it had complied with part III of Chapter 205 to the extent that it could, given the unfinished state of the formal county IAL designation process.  These FOFs were as follows:

> 555. The City IAL Process is set forth in HRS § 205-47.

> 556. DPP is currently in the process of hiring a consultant to provide assistance in making its IAL designation recommendations to the City Council. The DPP is expected to start the recommendation process later in 2012. In doing so, DPP will work with the City Agricultural Liaison; however, the process is ultimately a DPP initiative.

Moreover, with regard to the particular lands at issue, it would make no difference if the LUC awaited the completion of the formal IAL identification process, as the Petition lands were not designated IAL, were slated for urban development under county plans, and the county was not going to designate them as IAL, notwithstanding Resolution 12-23, which the following FOFs make clear:

> 557. The Petition Area is currently not designated as IAL, and the DPP stated that it will not be recommending the Petition Area as a potential.

> 558. On February 15, 2012, the City Council passed Resolution No. 12-23, entitled "Urging the City's Agricultural Liaison to Expedite the Identifying and Mapping of Important Agricultural Lands and Ensure that the City Works to Preserve the Availability of Agricultural Lands for Farming."

> 559. Resolution No. 12-23 would not change DPP's position on not including the Petition Area as a potential IAL area.

> 560. HRS §§ 205-44(c)(6) and 205-47(a) and (d), requires DPP to consider consistency with the ʻEwa DP and with the

Urban Boundary contained therein, in identifying IALs. HRS §§ 205-44, 205-47.

561. The City Council Committee Report No. 74, which was adopted by the Committee on Planning and Zoning in conjunction with Resolution No. 12-23, specifically states that the resolution "is not intended to influence the state Land Use Commission decision-making process on any case pending before the Commission."

This court again takes judicial notice of the fact that the DPP's current recommended IALs do not include Hoʻopili.  See http://mapoahuagland.com/about/faq/ (last visited Dec. 15, 2015).  Thus, under the facts of this case, reclassification would not be "violative of part III" because this particular parcel was not, and would not be, identified as IAL.

**V.  Conclusion**

The LUC in this case properly reclassified D.R. Horton-Schuler's property from the agricultural land use district to the urban land use district.  Article XI, Section 3 and Act 183 reveal no intent to require the LUC to stay reclassification proceedings pending formal designations of IALs.  Further, the Appellants did not provide persuasive argument that the LUC's D&O violated HAR § 15-15-77.  First, the Appellants did not challenge the LUC's finding that the reclassification was reasonably necessary for urban growth; therefore, this court is bound by that finding.  Even if it were not, substantial evidence supported the LUC's additional findings that the reclassification would not substantially impair agricultural

production.  Second, the Appellants did not provide argument on the issue of whether the reclassification violated the Hawai'i State Plan.  Consequently, we cannot conclude that the LUC's D&O violated HAR § 15-15-77.  For the foregoing reasons, the circuit court's decision and order, which affirmed the LUC's D&O and dismissed the Appellants' appeal, is affirmed.

We take this opportunity to reiterate, however, that pursuant to the first statute within Part III, HRS § 205-41, the legislature has declared as follows:

> **Declaration of policy.**  It is declared that the people of Hawaii have a substantial interest in the health and sustainability of agriculture as an industry in the State.  There is a compelling state interest in conserving the State's agricultural land resource base and assuring the long-term availability of agricultural lands for agricultural use to achieve the purposes of:
> (1) Conserving and protecting agricultural lands;
> (2) Promoting diversified agriculture;
> (3) Increasing agricultural self-sufficiency; and
> (4) Assuring the availability of agriculturally suitable lands,
> pursuant to article XI, section 3, of the Hawaii State Constitution.

Accordingly, although there is no basis under the law to overturn this reclassification, the state and county governments are reminded of the importance of agriculture to the future of

this state and of the need to effectuate the mandate of Article

XI, Section 3 through the implementation of Act 183.

Eric A. Seitz,                    /s/ Mark E. Recktenwald
Della A. Belatti,
and Sarah R. Devine,              /s/ Paula A. Nakayama
for petitioners
                                  /s/ Sabrina S. McKenna

Gregory W. Kugle
and Matthew T. Evans              /s/ Gary W. B. Chang
for respondent
D.R. Horton-Schuler
Homes, LLC

