NOT DESIGNATED FOR PUBLICATION

No. 122,783

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

COSHAUWN DEVAIL HAMILTON,
*Appellant*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; NANCY E. PARRISH, judge. Opinion filed March 11, 2022. Affirmed.

*Patrick H. Dunn*, of Kansas Appellate Defender Office, for appellant.

*Natalie Chalmers*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before BRUNS, P.J., GREEN and ISHERWOOD, JJ.

PER CURIAM:  Coshauwn Hamilton stands convicted of aggravated robbery, aggravated burglary, and aggravated battery. He appeals to this court seeking review of multiple allegations of error involving his conviction and sentence. He contends the State committed reversible prosecutorial error, that his jail credit calculation is not accurate, the trial court violated his right to a jury trial when it independently concluded he used a deadly weapon during the commission of the crimes, the Kansas Offender Registration Act (KORA) violates the Due Process Clause, and the use of his prior convictions to determine his sentence constituted another violation of his right to a jury trial. A

1

comprehensive review of Hamilton's case fails to yield anything to substantiate his claims. Thus, his convictions and sentence are affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

Christopher Hanser and Sarah Kneuper had an off-and-on relationship and lived together in Topeka. The couple also shared a 13-month-old daughter. Kneuper suspected infidelity on Hanser's part many times throughout their relationship. So during the summer of 2018, Kneuper began a clandestine relationship of her own. Coshauwn Hamilton, the couple's friend and former neighbor, was her paramour. Hanser eventually grew suspicious and confronted Hamilton about the relationship.

At the end of June, Hanser and Kneuper had a "domestic dispute" that prompted Kneuper to seek refuge at a local motel with their daughter. She contacted Hamilton and the two made plans to move in together and focus on building their relationship. Kneuper bought a bus ticket to enable Hamilton to get to Topeka from where he was staying in Kansas City. Hamilton arrived at the motel early on the morning of July 1, 2018.

Kneuper and Hamilton eventually left the motel to attend a party at the home of Hamilton's cousin. Later that evening, Kneuper contacted Hanser and asked him to please come pick her and their daughter up because the child was sick. Hanser agreed to do so and when he arrived, Kneuper left the gathering without telling Hamilton. A few hours later, Hamilton texted Kneuper to find out where she went and Kneuper explained that her daughter got sick, so she went to Hanser's house.

A short time later, Kneuper contacted 911 to report that Hamilton robbed her and Hanser. According to Hanser, Hamilton and another man showed up at the house wearing ski masks, but Hamilton removed his after Hanser told him that he recognized his voice. Hamilton then struck Hanser in the face with a gun, so Kneuper grabbed the couple's .22

2

revolver from a cabinet, pointed it at Hamilton, and pulled the trigger. She neglected to disengage the safety however, so the gun failed to fire as intended. Hamilton took the gun and instructed Kneuper to gather up any other weapons tucked away in the house. Hamilton also helped himself to knives and other valuables in the residence.

Hamilton's friend, Leon Wyrick, showed up during the robbery so Hamilton stepped out on the back porch to chat with him. Kneuper seized that opportunity to flee with her daughter and borrow an acquaintance's phone to contact 911. Law enforcement officers arrived quickly and Kneuper gave them Hamilton's name as the identity of the robber. Hanser then ran from the house and shouted to the officers that "Shawn" is "back there." Hanser also suspected that Kneuper shared some level of involvement in the robbery. Officers searched the area for suspects but to no avail.

An investigation ensued that led to Hamilton's apprehension. The State charged him with two counts of aggravated robbery, one each for Hanser and Kneuper as the victims, aggravated burglary, and aggravated battery and the case proceeded to a jury trial.

During the defense's case-in-chief, Hamilton's counsel called Jessica Rosemann as a witness. Rosemann informed the jury that she is a long-time friend of Hamilton's and picked him up in Kansas City in the morning or during the evening of either June 30 or July 1, 2018. According to Rosemann, Hamilton then remained in Kansas City with her family until after the 4th of July. As a result, it was impossible for him to be in Topeka to commit the crimes as the State alleged.

During its rebuttal, the State called Detective Ryan Hayden to counter Rosemann's testimony. Hayden informed the jury that during the week preceding Hamilton's trial, he learned of Rosemann and of Hamilton's intent to use her as an alibi witness. Upon receiving that information, he checked to see whether Hamilton's cell phone was included

3

among his possessions when he was booked into the jail because he wanted to check it for location data. Hayden explained that defense counsel had checked out the phone, so he did not have a chance to conduct the inquiry. During cross-examination the detective clarified that defense counsel followed the proper protocol to check out the phone and that the detective did not seek to retrieve it from her upon learning of its unavailability at the police department.

The State followed Hayden's testimony with that of Matthew Biltoft, a DOC employee. Biltoft testified that the prosecutor contacted him the previous evening and during that conversation Biltoft learned that one of Hamilton's belongings "had been released." The State asked Biltoft to specifically identify the timeframe when it was checked out, but before he could do so, defense counsel objected to its relevance. Discussion of the matter continued outside the presence of the jury and counsel for Hamilton argued that the State sought to cast a specter of nefariousness over counsel's acquisition of the phone. Hamilton's counsel assured the court that she checked out the phone only to obtain contact information for Hamilton's potential alibi witnesses, but that the only way to defend against the State's thinly veiled accusation was to have defense counsel testify. The court agreed to allow Hamilton's counsel to testify but cautioned that it would order a mistrial if her testimony disqualified her from further representation. The State objected to the court's decision to grant counsel the latitude to testify.

Ultimately, counsel opted not to personally take the stand and instead called Hamilton as a witness to testify for the restricted purpose of clarifying defense counsel's motivation in obtaining Hamilton's phone. He provided his name and acknowledged he had property at the Shawnee County Jail. His attorney then wanted to know whether the phone contained "useful information" and Hamilton responded in the affirmative. On cross-examination, the State tried to ask Hamilton whether the phone contained information that would "place [him] in Topeka on July 1st, 2018." Before Hamilton could

respond, defense counsel objected that the inquiry fell outside the scope of direct examination and the court sustained the objection.

A jury convicted Hamilton of three of the four charged offenses. It could not reach a verdict on the charge of aggravated robbery with Kneuper as the victim. Relying on a criminal history score of G, the court sentenced Hamilton to 72 months' imprisonment and found that he committed the offenses with a deadly weapon, which mandated that he register as a violent offender for 15 years.

Hamilton now brings his case to us to analyze and resolve the errors he alleges occurred during his trial and at sentencing.

ANALYSIS

DID THE STATE IMPERMISSIBLY INSINUATE THAT DEFENSE COUNSEL WITHHELD CELL PHONE EVIDENCE THAT WOULD PLACE HAMILTON IN TOPEKA WHEN THE CRIMES OCCURRED, AND THEREBY COMMIT REVERSIBLE PROSECUTORIAL ERROR?

Hamilton contends that the State, without a good-faith basis for doing so, insinuated that defense counsel checked out Hamilton's cell phone with the malicious intent of concealing evidence to stymie the State's efforts to verify Hamilton's whereabouts at the time of the crimes. He argues the prosecutor crafted this narrative using rebuttal witnesses who averred that counsel checked out the phone, an objection to defense counsel's effort to testify and provide an explanation, and through questions posed to Hamilton on cross-examination designed to elicit statements that the cell phone would be useful in clarifying his location on that evening. Hamilton asserts the State lacked a good-faith basis to imply that Hamilton's phone contained inculpatory evidence, particularly where it neglected to retrieve the phone to either confirm or deny its suspicion.

5

By contrast, the State contends Hamilton failed to properly preserve this issue for our review. It also highlights the fact that defense counsel neglected to provide notice of Hamilton's alibi until the first day of trial and clarifies that it offered the rebuttal testimony Hamilton now complains of in order to counter the argument it anticipated defense counsel would make in closing argument, that law enforcement conducted a subpar investigation. The State denies Hamilton's claim that it implied to the jury that defense counsel had suspect motives in checking out the phone. Finally, the State asserts it did possess a good-faith basis for inquiring whether the information contained on Hamilton's phone placed him in Topeka the night of the robbery. In support of this contention, it points to the fact that testimony elicited at trial established that Kneuper bought a bus ticket for Hamilton to travel to Topeka and the two exchanged several text messages related to that trip.

Appellate courts use a two-step process to evaluate claims of prosecutorial error: error and prejudice. *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). To determine whether prosecutorial error occurred, the court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that offends the defendant's constitutional right to a fair trial. If the prosecutor erred, we must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, the court applies the traditional constitutional harmlessness inquiry demanded by *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). "In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, i.e., where there is no reasonable possibility that the error contributed to the verdict.'" *Sherman*, 305 Kan. at 109.

*Hamilton did not properly preserve his claims of prosecutorial error for appellate review.*

Appellate courts will review a prosecutorial error claim based on a prosecutor's comments made during voir dire, opening statement, or closing argument even without a timely objection. *State v. Butler*, 307 Kan. 831, 864, 416 P.3d 116 (2018). But the same cannot be said of evidentiary claims. In those instances, it is incumbent upon defense counsel to enter a contemporaneous objection in order to preserve the matter for appellate review. Defendant cannot make an end run around the contemporaneous objection rule by recharacterizing an evidentiary issue as one of prosecutorial error. The contemporaneous objection rule is not satisfied when counsel objects on one basis at trial and argues a different theory on appeal. *State v. Lowery*, 308 Kan. 1183, 1195-96, 427 P.3d 865 (2018). Without a continuing objection, an objection is required each time the allegedly inadmissible evidence is introduced. *State v. Dupree*, 304 Kan. 43, 63, 371 P.3d 862 (2016); *McKissick v. Frye*, 255 Kan. 566, 582, 876 P.2d 1371 (1994).

In support of his contention of error Hamilton first directs our attention to the questions posed and evidence elicited from the State's rebuttal witnesses. But the record before us does not reflect that counsel vocalized an objection when the evidence was first introduced. That is, when Detective Ryan informed the jury that defense counsel checked the phone out from Hamilton's belongings. Rather, no objection was entered in relation to questioning involving the cell phone until the second rebuttal witness testified. As a result, we are prohibited from reviewing Hamilton's claim that error occurred when the prosecutor engaged in this line of questioning.

Hamilton next argues the prosecutor lacked a good-faith basis to ask him on cross-examination whether his cell phone proved he was in Topeka on July 1, 2018. As a general rule, counsel may not make assertions of fact in the form of questions to a witness absent a good-faith basis for believing the asserted matters to be true. *State v.*

*Kleypas*, 272 Kan. 894, 1089, 40 P.3d 139 (2001), *overruled on other grounds by State v. Marsh*, 278 Kan. 520, 102 P.3d 445 (2004).

Before delving into our analysis of Hamilton's claim, we pause to address a tangentially related matter. As stated above, Hamilton agreed to take the stand in a limited capacity following the State's objection to the option of defense counsel testifying to explain her rationale in checking out the phone. Hamilton contends the prosecutor's objection in that regard constituted error, but he does not offer a compelling argument in support of that position. In our view, the prosecutor's objection was proper based on the rules of professional conduct for attorneys which generally provide that an attorney should not be a witness in a case in which the attorney is an advocate. See Kansas Rule of Professional Conduct 3.7(a) (2022 Kan. S. Ct. R. at 399). At the bench conference, the court questioned the parties on whether an exception to the rule would apply. Hamilton eventually jumped in and offered to testify to explain why defense counsel had checked out the phone, resolving the dispute. The prosecutor's stance cannot be classified as erroneous.

Returning to the primary issue at hand, while the prosecutor carries the burden to have a good-faith basis for posing such questions, equally true is Hamilton's obligation to enter an objection when that required factual basis is lacking. That did not happen here. Rather, Hamilton asserted that the question exceeded the scope of direct examination, and the district court sustained the objection on that basis. Thus, the State did not receive the opportunity to proffer its factual basis and establish that it fulfilled its burden. If the prosecutor, in good faith, believed that the information contained on the phone placed Hamilton in Topeka at the time in question, it would have been relevant to rebut Hamilton's alibi. Hamilton's failure to object and trigger the prosecutor's proffer precludes review of this issue on appeal. See *Kleypas*, 272 Kan. at 1089-90; *State v. Jones*, 47 Kan. App. 2d 512, 525-26, 276 P.3d 804 (2012) (holding objection that a

question was beyond the scope of cross-examination was not sufficient to preserve for appellate review issue of whether State had an evidentiary basis for its question).

### THE STATE DID NOT COMMIT PROSECUTORIAL ERROR WHEN IT SOUGHT TO EXPLAIN THE JURY'S ABILITY TO USE ITS COMMON SENSE WHEN EVALUATING THE EVIDENCE BY OFFERING AN ANALOGY ABOUT WAKING UP TO MOISTURE OUTDOORS

Hamilton commits this portion of his prosecutorial error issue to a contention that the prosecutor erred when he told the jurors they could simply rely on common sense rather than the correct burden of beyond a reasonable doubt. He asserts the State compounded the error when it tried to communicate this point via a "snow on the ground" analogy but then bungled the analogy.

The State argues the prosecutor properly informed the jurors that they could use their common sense and life experiences when weighing evidence and did not impermissibly try to define the State's burden of proof.

Hamilton did not object to the challenged comments below, but an objection is not required for this particular allegation of error. Appellate courts will review a claim of prosecutorial error based on comments made during voir dire and closing argument even without a timely objection, though the court may figure the presence or absence of an objection into its analysis of the alleged error. *Butler*, 307 Kan. at 864.

During jury selection, the prosecutor informed the prospective jurors that, "It's the State's requirement to establish beyond a reasonable doubt that the defendant is guilty of the crime that we're accusing him of." He then engaged in a long discussion to explain that its standard of proof was not beyond *all* doubt and inquired whether any of them would hold the State to such a heightened standard. The prosecutor next stated:

9

"Also, speaking of coming through those doors, everyone here has life experience, common sense, things that have prepared them to hear facts of the case, evidence, and use that life experience and common sense to reach a determination in the case. So when you come through those doors, I don't want you to leave that common sense or life experience at that door. Things aren't—things don't change in here; there's no magic show or anything like that. You're just going to use your life experience and common sense to listen to the evidence and reach a verdict."

The prosecutor first used the example of cookies disappearing from a cookie jar and asked one of the prospective jurors how they would determine which of their children ate the cookies when both accused the other. He then turned to the moisture example that Hamilton now challenges as erroneous:

"MR. GREEN:  If you went to bed tonight, and in your neighborhood, it's dry; when you drive home, it's dry everywhere; when you went to sleep, it was still dry outside. But when you woke up, it was wet everywhere. You go out to go to work and it's wet everywhere. What happened?

"PROSPECTIVE JUROR 31:  I'm assuming it rained.

"MR. GREEN: Okay. Good.

How about you [ ] Juror Number 14, if you went to sleep today and it's dry everywhere, you woke up in the morning, on your way to work—or wherever you're going—it's wet everywhere. What do you think happened?

"PROSPECTIVE JUROR 14:  Something would have to have caused participation. Could be rainfall, snow, whatever, something along that line.

"MR. GREEN: Okay. So [Juror 31] says it rained. That's common sense, right?

. . .

[Juror 14] says, because we live in Kansas, it might have snowed, it may have been fog, it could have been anything, but there was something with precipitation. Somehow everything got wet. Again, I know I'm asking questions you're kind of leery to answer but, guess what, you guys are right. These are just common sense stuff. That's what we're asking you to use, that simple logic, conductive reasoning, as you listen to all the evidence, all the witnesses. You're evaluating all that information and using our life experiences to come to the conclusion, okay?

Then, at the end of his closing argument, the prosecutor stated:

"The defense says: He wasn't there. Or is it their defense that Sarah Kneuper was in on it? I don't know. If she's in on it, an aggravated robbery happened July the 1st, 2018. Aggravated battery happened on July 1st, 2018. That doesn't change the fact that what happened, I'd submit to you Sarah Kneuper's testimony is true. Christopher Hanser's testimony is true, it's accurate.

You can read the text messages. They wasn't [sic] even getting along with each other. So the theory of the defendant not being there and Sarah Kneuper and Christopher Hanser picking this guy, this is when we use our common sense. This is when we use our life experience. What does the evidence say? What have you seen?

We talked in opening about wanting more, it's human nature to want more, to have that feeling. This isn't a case where you need more. We have more. This isn't one person saying one person did something. This is two people saying that this person did something. This is an investigation, officers trying to track down evidence. This is an alibi that pops up the Friday before trial. All of the evidence and facts and testimony you've heard in the last couple of days and all your life experience and all your common sense, when you go back there and deliberate this case, I want you to come back and look at that verdict form and to say, We, the jury, find the defendant guilty . . .

We talked about during our voir dire process, if it's dry outside, you go to sleep, you wake up, and it's wet everywhere, it's probably rained. When you go back to deliberate the facts in this case, evaluate the evidence, this is wet everywhere."

It is error for a prosecutor to equate reasonable doubt and common sense. But "it is not error for the prosecutor to mention common sense in the closing argument or to tell the jury that it can use common sense in reaching its decision." *State v. Mitchell*, 269 Kan. 349, 360, 7 P.3d 1135 (2000); see *State v. Finley*, 273 Kan. 237, 248-49, 42 P.3d 723 (2002). In *Mitchell*, the prosecutor watered down the reasonable doubt standard by telling the jury that the State had "a common sense burden" of proof. In doing so, the prosecutor impermissibly led the jury to believe it could convict the defendant using a burden of proof less than reasonable doubt. "While the jury is free to use common sense

to evaluate the evidence and the testimony, the burden of proof remains 'reasonable doubt.'" 269 Kan. at 360-61.

The prosecutor's statements about common sense in Hamilton's case do not equate with the error identified in *Mitchell*. Here, the prosecutor fully explained to the prospective jurors that the State had the burden to prove Hamilton guilty beyond a reasonable doubt. It was only in the wake of that discussion that the prosecutor mentioned their latitude to also use common sense when listening to the evidence. That practice is acceptable. See *Mitchell*, 269 Kan. at 360-61.

This case shares greater similarities with *State v. Diggs*, 272 Kan. 349, 363, 34 P.3d 63 (2001), in which the court declined to find that the prosecutor's comments were erroneous. In so doing, the court specifically stated, "the prosecutor did not define reasonable doubt as 'common sense' . . . [h]e told the jurors that they could apply common sense to the facts in their deliberations." 272 Kan. at 363. We conclude that is what happened here. The prosecutor clarified the reasonable doubt standard in voir dire, explained how common sense could be used by the jurors when weighing the evidence, and then reiterated that point in closing argument.

A prosecutor is not permitted to use analogies that lower the State's burden of proof. See *Sherman*, 305 Kan. at 115-16 (Mount Rushmore analogy, in which one face was removed and the jury was asked if they had any reasonable doubt what the landmark was despite the missing face, would be error if used today); *State v. Crawford*, 46 Kan. App. 2d 401, 414, 262 P.3d 1070 (2011), *aff'd* 300 Kan. 740, 334 P.3d 311 (2014) (prosecutor erred when using an analogy of a jigsaw puzzle saying although some pieces are missing, a juror could still say the puzzle looks like a lighthouse and an ocean).

But analogies are permitted when they are used to explain to the jurors that they can convict the defendant based on circumstantial evidence, that direct evidence is not

required. *Lowery*, 308 Kan. at 1204. In *Lowery*, the court determined the prosecutor used a picture analogy to explain the role of circumstantial evidence, not to dilute the reasonable doubt standard. The court distinguished the facts before it from those cases in which the prosecutor explicitly tied an analogy to the reasonable doubt standard. The *Lowery* court also cited favorably a "snow on the ground" analogy from 4 Lane Goldstein Trial Technique § 23:99 (3d ed. 2015) that is strikingly similar to the analogy the prosecutor implemented here: "'Assume that when you go to sleep there is no snow on the ground, if the next morning when you wake up there is snow on the ground, that is strong circumstantial or indirect evidence of the fact that it snowed during the evening. You don't need an eyewitness who actually saw it snowing in order to come to that conclusion.'" 308 Kan. at 1204.

Here, the purpose of the prosecutor's moisture analogy was not as clear as the snow analogy referenced above because, as was pointed out during jury selection, the potential explanations for when it is wet outside encompass more than rain. The prosecutor did not link the analogy to circumstantial evidence, but he did not tie it to the State's burden of proof either. Rather, he employed the analogy as a tool to attempt to show the role one's common sense can play in evaluating the veracity of testimony.

We must analyze the prosecutor's statements in the context in which they were made rather than in isolation. *State v. Thomas*, 307 Kan. 733, 743-44, 415 P.3d 430 (2018) ("Immediately before the prosecutor made these challenged comments, he unequivocally told the jury that the State was required to prove the elements of aggravated battery beyond a reasonable doubt."); *State v. Tabares*, No. 109,348, 2014 WL 1302629, at *8 (Kan. App. 2014) (unpublished opinion) (the disputed statement in closing argument discussing common sense came directly before stating that the correct burden was beyond a reasonable doubt).

13

The prosecutor in Hamilton's case first stated the appropriate standard as reasonable doubt then explained the differences between that and a "no doubt" standard before transitioning to discussion about common sense and ultimately his use of the disputed analogy. Read in context, the prosecutor used the moisture analogy to explain how the jury's common sense can factor into its evaluation of the evidence. To that end, the intent of the analogy aligned with the court's instruction to the jury, "You have a right to use common knowledge and experience in regard to the matter about which a witness has testified."

We conclude that the prosecutor's comments here "'scuffed the line of [error] without actually crossing it.'" *Lowery*, 308 Kan. at 1204. Again, we acknowledge that Kansas courts have found that analogies are not objectionable when employed for a legitimate purpose, and it is not our intention to depart from that position here today. We also recognize the long-standing principle that the State is afforded wide latitude in its language and may permissibly turn to reasonably impassioned, picturesque language in presenting its case. That said, this case offers a good example of how creative analogies, while clever and engaging, are also exceptionally risky and should be used with caution. What the prosecutor believes and intends to be a fine illustration of a concept may, in truth, only create greater confusion.

DID THE TRIAL COURT ERR IN ITS COMPUTATION OF HAMILTON'S JAIL CREDIT?

Hamilton argues the trial court erred in failing to grant him another 34 days of jail credit. After he filed his brief for this appeal, the trial court entered an agreed order *nunc pro tunc* increasing Hamilton's jail credit by 34 days, from 260 to 294 days. Hamilton does not contest the State's assertion that the court's adjustment renders this issue moot and negates any need for remand on the matter.

DOES IMPOSING VIOLENT OFFENDER REGISTRATION BASED ON A JUDICIAL FINDING OF FACT THAT THE OFFENDER USED A DEADLY WEAPON VIOLATE *APPRENDI*?

Hamilton contends that when the trial judge independently concluded he used a deadly weapon during the commission of his crimes, it violated his right to a jury trial and flouted the rule set forth in *Apprendi v. New Jersey*, 530 U.S. 466, 489, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). He acknowledges that our Supreme Court held KORA's registration requirement was not punishment for *Apprendi* purposes in *State v. Huey*, 306 Kan. 1005, 1010, 399 P.3d 211 (2017), but asserts the *Huey* court reached an erroneous conclusion. He argues that because he is unable to expunge any convictions while he is required to register, KORA constitutes punishment.

The *Huey* court held that the Legislature intended KORA to be civil and nonpunitive and that "only the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal remedy." 306 Kan. 1005, Syl. ¶¶ 1-2. A court must consider several factors to determine whether KORA's effects render it punitive as applied to violent offenders. The questions are fact-intensive and require a robust record. *Huey*, 306 Kan. at 1010 (*citing Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69, 83 S. Ct. 554, 9 L. Ed. 2d 644 [1963]). Huey, like Hamilton does here, raised his *Apprendi* challenge for the first time on appeal. The court found that without a sufficient record, it could not conclude the effects of KORA were so punitive as to override the Legislature's intent for KORA to operate as a civil remedy. Huey carried the burden to make such a showing and he failed to do so. 306 Kan. at 1010.

In *State v. Carter*, 311 Kan. 206, 217, 459 P.3d 186 (2020), our Supreme Court reaffirmed its holding that a trial court's determination under K.S.A. 2019 Supp. 22-4902(e)(2) that an offender used a deadly weapon during the commission of his or her crimes does not constitute impermissible judicial fact-finding prohibited by *Apprendi*.

Hamilton does not direct us to any changes adopted to KORA since the Supreme Court addressed this issue. Without any indication the court is departing from this position, we are duty-bound to follow its precedent. *State v. Rodriguez*, 305 Kan. 1139, 1144, 390 P.3d 903 (2017).

DOES THE LACK OF A BURDEN OF PROOF OR SPECIFICALLY DELINEATED PROCESS THROUGH WHICH AN OFFENDER CAN CONTEST THE TRIAL COURT'S DISCRETIONARY FINDING UNDER K.S.A. 22-4902(e)(2) CAUSE A DUE PROCESS VIOLATION?

In his next claim of error, Hamilton contends KORA violates his right to due process because the statute does not provide for an opportunity to contest the trial court's discretionary deadly weapon finding nor does it specify what burden of proof must be met before such a finding can be made. See K.S.A. 2020 Supp. 22-4902(e)(2). He also asserts that beyond a reasonable doubt should be adopted as the appropriate standard. Hamilton neglected to present this claim to the trial court for consideration but argues we may reach the issue for the first time on appeal because it implicates the denial of his fundamental due process rights. We may consider Hamilton's arguments for the first time on appeal as necessary to prevent the denial of fundamental rights, but such an analysis is discretionary, not mandatory. *State v. Gray*, 311 Kan. 164, 170, 459 P.3d 165 (2020).

Under KORA, an individual must register as a violent offender if he or she is convicted of a person felony and "the court makes a finding on the record that a deadly weapon was used in the commission of such person felony." K.S.A. 2020 Supp. 22-4902(e)(2).

Procedural due process constrains governmental actions which deprive individuals of liberty or property interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendments. "'The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner."'" *State v.*

16

*Juarez*, 312 Kan. 22, 24, 470 P.3d 1271 (2020) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 332, 96 S. Ct. 893, 47 L. Ed. 2d 18 [1976]).

A statute's constitutionality is a question of law subject to unlimited review. Appellate courts presume statutes are constitutional and must resolve all doubts in favor of a statute's validity. Courts must interpret a statute in a way that makes it constitutional if there is any reasonable construction that would maintain the Legislature's apparent intent. *State v. Gonzalez*, 307 Kan. 575, 579, 412 P.3d 968 (2018).

Panels of this court have rejected both of Hamilton's arguments. Hamilton first argues that KORA violates the Due Process Clause because there is no express provision outlining a process for contesting the trial court's discretionary deadly weapon finding. But as one panel noted, "by the same token, KORA does not preclude some form of due process hearing on a district court's consideration of a deadly weapon finding. The statutory silence supports [the appellant's] argument for an opportunity to be heard if for no other reason than as a matter of constitutional avoidance." The panel then presumed that offenders have a protected right to be heard about the deadly weapon finding despite the statutory silence. *State v. Ruwart*, No. 121,621, 2021 WL 1703646, at *3 (Kan. App. 2021) (unpublished opinion), *rev. denied* 314 Kan. 858 (2022).

Hamilton has failed to show that the lack of a specifically outlined procedure to contest the discretionary weapon finding violates the Due Process Clause. He also does not establish for us that he pursued but was denied access to any such opportunity to be heard. Under the facts here, an argument of that nature would fail given that the sentencing court specifically asked the parties for arguments about Hamilton's requirement to register. The State argued Hamilton had to register because he committed a person felony with a deadly weapon. Hamilton's counsel responded that she did not have any argument to present regarding registration.

17

Hamilton next argues the failure of KORA to specify a burden of proof for the deadly weapon finding violates Due Process and that the burden of proof should be "beyond a reasonable doubt." But the failure of K.S.A. 2020 Supp. 22-4902(e)(2) to specify a burden of proof does not violate the Due Process Clause. A majority of our Supreme Court has repeatedly held that KORA is a "'nonpunitive civil regulatory scheme.'" *State v. Carter*, 311 Kan. 206, 213, 459 P.3d 186 (2020). Civil statutes that fail to specify a standard of proof implicitly contain a preponderance of evidence standard unless "'particularly important individual interests or rights are at stake.'" *In re B.D.-Y*, 286 Kan. 686, 691, 187 P.3d 594 (2008); *State v. Ford*, No. 119,328, 2019 WL 3242420, at *5 (Kan. App. 2019) (unpublished opinion), *rev. denied* 311 Kan. 1048 (2020).

Several panels of this court have concluded that the preponderance standard applie to the deadly weapon finding in K.S.A. 2020 Supp. 22-4902(e)(2) because:

- the Legislature did not state otherwise as it did in subsection (c)(18)
- the registration requirements do not implicate interests as fundamental or important as those that trigger a heighted burden of proof such as the interests involved in the termination of parental rights or the liberty interests at issue in civil commitment cases
- the private interests affected by KORA registration are outweighed by the government interest in public safety
- there is a low risk of an erroneous deprivation of private interests through use of the preponderance standard because whether the defendant used a deadly weapon is an objective determination.

*Ruwart*, 2021 WL 1703646, at *3-4; *State v. Epp*, No. 121,872, 2020 WL 6930597, at *6-8 (Kan. App. 2020) (unpublished opinion), *petition for rev. filed* December 28, 2020; *Ford*, 2019 WL 3242420, at *5-6.

18

Notably, the *Ford* panel reasoned:

"Weighing against a defendant's lesser private interests is the government's considerable interest in protecting the public. The purpose of KORA is to protect the public from designated offenders whom the Legislature has concluded are likely to reoffend. *State v. Wilkinson*, 269 Kan. 603, 609, 9 P.3d 1 (2000). Unlike other proceedings requiring a heightened standard of proof, the possible injury to a defendant from an erroneous classification as a violent offender under K.S.A. 2018 Supp. 22-4902(e)(2) is not 'significantly greater than any possible harm to the state.' *Addington*, 441 U.S. at 427. Although KORA registration affects an offender's private interests, the impacted interests are not as fundamental or important as the interests involved in the parent-child relationship or civil commitment. And given the government's compelling interest in protecting the public from violent offenses committed by recidivists, the State is not constitutionally required to bear a disproportionate share of the risk of error." *Ford*, 2019 WL 3242420, at *6.

The reasoning of the panels that have already considered this issue is sound. Due process does not require the trial court to find beyond a reasonable doubt that the offender used a deadly weapon under K.S.A. 2020 Supp. 22-4902(e)(2).

DOES THE USE OF HAMILTON'S PRIOR CONVICTIONS TO DETERMINE HIS SENTENCE VIOLATE HIS JURY TRIAL RIGHT UNDER SECTION 5 OF THE KANSAS CONSTITUTION BILL OF RIGHTS OR THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION?

For his final issue on appeal, Hamilton contends the use of his prior convictions to determine his sentence violated his jury trial rights under Section 5 of the Kansas Constitution Bill of Rights and the Sixth Amendment to the United States Constitution.

As Hamilton acknowledges, our Supreme Court has repeatedly rejected this challenge with respect to the United States Constitution. See e.g., *State v. Sullivan*, 307 Kan. 697, 708, 414 P.3d 737 (2018) (reaffirming *State v. Ivory*, 273 Kan. 44, 46-47, 41 P.3d 781 [2002]).

19

Recently, our Supreme Court also rejected this challenge with respect to the Kansas Constitution. In *State v. Albano*, 313 Kan. 638, Syl.¶ 4, 487 P.3d 750 (2021), the court held: "Section 5 of the Kansas Constitution Bill of Rights does not guarantee defendants the right to have a jury determine the existence of sentence-enhancing prior convictions under the revised Kansas Sentencing Guidelines Act."

With no indication our Supreme Court is departing from these positions, we are duty-bound to follow this precedent. *Rodriguez*, 305 Kan. at 1144. Hamilton's sentence does not violate either Constitution.

Affirmed.